DOLORES SANTAELLA NEGRÓN, demandante, recurrida y recurrente *v.* PHILIP LICARI y SAN JUAN DARLINGTON, INC., demandados, recurridos y recurrente la segunda.

Número: 12367.  Resuelto: 22 de noviembre de 1961.

*Benicio Sánchez Castaño y R. Rivera Cervera,* abogados de la demandada y recurrente; *Ángel Viera Martínez,* abogado de la demandante y recurrente.

Sala integrada por el Juez Asociado señor Blanco Lugo, como Presidente de Sala, y los Jueces Asociados señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Se trata de una acción de daños y perjuicios por lesiones personales. La demandada San Juan Darlington, Inc. es dueña de y explota un edificio de doce pisos denominado "San Juan Darlington" sito en el número 600 de la Avenida Fernández Juncos en Santurce, P. R. La primera planta de dicho edificio está dedicada a oficinas y establecimientos comerciales y los restantes once pisos están dedicados al arrendamiento de apartamientos residenciales. El demandado Philip Licari es abogado y para la fecha de autos tenía su oficina en la primera planta del San Juan Darlington, local que ocupaba en calidad de inquilino de la codemandada. El mencionado edificio tiene en su primer piso un pasillo central que da acceso a varias oficinas y locales comerciales que están situados a ambos lados de dicho pasillo.

El día de autos la demandante y una hermana suya salieron de un salón de belleza del cual eran clientes y el que estaba ubicado en la primera planta del mencionado edificio, y caminaban hacia la calle a lo largo del referido pasillo central. Mientras así caminaban el demandado Licari abrió de pronto la puerta de su oficina dándole a la demandante por su lado derecho tirándola al pavimento. Dicha puerta

abre hacia afuera, o sea, hacia el pasillo y la misma tiene unas 36 pulgadas de ancho. Fue abierta por el Licenciado Licari mientras éste estaba dentro de su oficina.

De acuerdo con las conclusiones de hecho del tribunal sentenciador el accidente ocurrió el 22 de julio de 1955; ese día fue examinada la perjudicada por un médico en su casa de ella; el día 23 la examinó el facultativo especialista en huesos que fue llamado; ese mismo día se le tomaron placas de rayos X a la paciente en su hogar; el 24 de julio fue hospitalizada, y fue operada al día siguiente. Regresó la demandante a su hogar el 9 de agosto siguiente, en ambulancia, y quedó recluida en cama por más de dos meses. En octubre el doctor ordenó que la levantaran debido a un brote de pulmonía que sufrió, y pasaba media hora al día en un sillón de ruedas. A la fecha del juicio, en 8 de noviembre de 1956, solo había podido sentarse en el sillón de ruedas; no podía caminar ni aún con muletas. Antes del accidente la demandante gozaba de buena salud y caminaba sin ayuda alguna. A la fecha de los hechos la demandante tenía 74 años de edad y pesaba 140 libras.

Los daños sufridos por la demandante están descritos por el Tribunal a quo en su opinión en la forma siguiente:

"El examen médico efectuado por el Dr. Espinosa el día siguiente de la caída reveló la existencia de trauma en ambos hombros y brazos y trauma con fractura de la cadera izquierda. El trauma del lado derecho era una equimosis en la cara lateral del brazo derecho desde el hombro hasta el brazo. Había equimosis en el hombro izquierdo extendida también al brazo. Había extravasación sanguínea de la conjuntiva del ojo izquierdo y había desplazamiento de la cadera lo cual requería una operación. En la operación se le abrió la cadera y se le colocó en la fractura un clavo especial para fijar los fragmentos. La fractura fue subcapital inmediatamente debajo de la cabeza del fémur con desplazamiento del hueso de su sitio. Después de operada se le puso a la demandante una bota de yeso desde algo más arriba del tobillo cubriendo el pie para evitar el movimiento de la pierna hacia afuera. Al abandonar el Auxilio Mutuo la demandante continuó en su hogar en una cama de

posición hasta que pudo sentarse en un sillón de ruedas. De acuerdo con el último estudio radiográfico hecho unas dos semanas antes del juicio, el médico autorizó a la demandante a afirmar el pie asida o apoyada en dos barras construidas a tal fin. El último examen médico de la paciente revelaba: (1) atrofia de la extremidad por desuso debido a la fractura; (2) debilidad de la extremidad por desuso; (3) inflamación de la rodilla izquierda con limitación considerable del movimiento de la rodilla, una limitación de 65 grados de la flexión, siendo lo normal 90 grados; y (4) cierta limitación secundaria en el movimiento de la otra pierna, la derecha. Este estado influye en la parte sicológica de la paciente y en su estado de ánimo, debido a la invalidez y a la incapacidad para atenderse, así como en la función fisiológica en general. Las radiografías más recientes demuestran que la fractura ha unido.

"Manifestó el Dr. Espinosa en la silla de los testigos que a esa fecha el pronóstico era aún de carácter reservado, o sea, que la condición de la demandante puede ir evolucionando eventualmente en forma satisfactoria, con la inflamación de la rodilla izquierda molestando mucho y quizás indefinidamente; o también, que puede surgir necrosis de la cabeza del hueso, o sea, morirse y deformarse. Esto último causaría dolor al afirmar y afectaría el sistema circulatorio y haría necesario tal vez remover, mediante cirugía, la cabeza del hueso."

La demandante reclamó $50,000.00 por daños, más los gastos médicos incurridos y las costas y honorarios de abogado. El Tribunal Superior declaró sin lugar la demanda en cuanto al demandado Licari y con lugar en cuanto a la San Juan Darlington Inc. condenándola a pagar $12,000.00 por concepto de daños, $2,451.06 por gastos médicos, más las costas y $500.00 de honorarios de abogado.

La recurrente alega que el Tribunal sentenciador erró (1) al dar eficacia a la prueba y al resolver que la arrendadora fue negligente, y al dejar de resolver que los negligentes fueron la demandante y el codemandado Philip Licari; (2) al sentenciar sin prueba a la arrendadora y al "formular conclusiones subjetivas privando a la recurrente de su derecho a interrogar y del debido proceso de ley"; y

(3) al imponerle sin base legal el pago de una compensación desproporcionada y al condenarla al pago de honorarios de abogado.

Vamos a discutir conjuntamente los errores señalados con los números uno y dos por estar estos íntimamente relacionados. En apoyo de su posición la demandada en su alegato levanta las siguientes tres cuestiones, las cuales debemos considerar: (a) Que la arrendadora no es responsable de los daños sufridos por la demandante sino que lo es el inquilino Licari, porque él y no la arrendadora tenía el control de su oficina y de la puerta de la misma. (b) Que la arrendadora estaba obligada a tener esa puerta en forma que abriese para afuera, en vez de hacia adentro, porque así se lo exigían los reglamentos de la Junta de Planificación de P. R., los reglamentos del Servicio de Bomberos, el "Código Nacional de Construcción" (National Building Code), y porque los planos del edificio fueron aprobados por el Negociado de Permisos de P. R. (c) Que la prueba no tiene el alcance o consecuencias legales de hacer a la demandada responsable de los daños.

■ *Responsabilidad de la arrendadora.* Es un principio general bien establecido y seguido uniformemente por la jurisprudencia que cuando un edificio consta de varios apartamientos o locales y estos se arriendan a distintos inquilinos, las entradas, vestíbulos, escaleras y pasillos de uso común quedan, salvo pacto en contrario, en la posesión y bajo el control del arrendador, y en consecuencia la responsabilidad por su condición y seguridad descansa sobre él. El arrendador tiene el deber de velar porque tales facilidades de uso común estén en condiciones que ofrezcan seguridad tanto a los inquilinos como a las personas que legítimamente tengan acceso al edificio. Entre estas personas que entran en forma legítima al edificio se encuentran los clientes de los negocios allí establecidos. *Ramírez v. Hotel Condado*, 68 D.P.R. 953, 955 (1948); *Torres* v. *Fernández*, 56 D.P.R. 482, 493

(1940) ; *Nunan* v. *Dudley,* 91 NE 2d. 840 (1950) ; *Wool* v. *Larner,* 26 A.2d 89, 92 (1942) ; *Pickford* v. *Abramson,* 152 Atl. 317, 318 (1930) ; *United Shoe Machinery Corp.* v. *Paine,* 26 F.2d 594 (1928) ; 26 A.L.R.2d 476; 25 A.L.R.2d 446; 97 O.L.R. 221; 25 A.L.R. 1273; *2 Restatement of the Law of Torts,* sec. 360, p. 976; *Prosser on Torts,* 2d ed., sec. 80, p. 471; Harper & James, *The Law of Torts,* Vol. 2, sec. 27.17, p. 1516.

No podemos por lo tanto descartar de plano la posibilidad de que exista responsabilidad de parte de la arrendadora. La perjudicada fue estropeada por una parte o accesorio del edificio que le dio mientras ella caminaba por el pasillo central de uso común; ella no estaba en la oficina del inquilino Licari, ni siquiera entraba o salía de dicha oficina. La demandante utilizaba dicho pasillo en forma legítima pues salía de uno de los negocios establecidos en esa planta del edificio (el salón de belleza) y caminaba hacia la calle adonde abordaría un taxímetro.

■ *Los . reglamentos.* Consideremos ahora el planteamiento de la demandada en el sentido de que ella estaba obligada a mantener esa puerta abriendo hacia afuera porque así se lo exigían los reglamentos del gobierno. Cita la demandada el Reglamento de Edificación, que es el Reglamento de Planificación Núm. 7 de la Junta de Planificación de Puerto Rico, y hace referencia a los artículos 113(b) y 125 de dicho reglamento. Este reglamento se encuentra en el Título 23 de las *Reglas y Reglamentos de P. R.,* sección 43–1 y siguientes.

En primer lugar, de la prueba surge que cuando se aprobaron los planos del San Juan Darlington no existía en Puerto Rico tal Reglamento de Edificación. Los planos de ese edificio fueron aprobados por el Negociado de Permisos el 4 de agosto de 1950. El Reglamento de Edificación de Puerto Rico fue adoptado por la Junta de Planificación cuatro años más tarde, en 11 de agosto de 1954 y aprobado por el Gobernador en 13 de agosto de ese mismo año. *23 R.R.P.R. 43–1,*

anotación. Para la fecha en que se aprobaron los planos del edificio no existía en Puerto Rico un código de construcciones, según declaró el propio perito presentado por la demandada, Sr. Héctor Deliz, que había sido el Oficial de Permisos precisamente cuando se aprobaron dichos planos. De manera que queda claro que como el Reglamento de Edificación no existía para el 1950 no pudo dicho reglamento exigir nada en relación con los planos en cuestión.

En segundo lugar, veamos si los artículos citados por la demandada del mencionado reglamento, vigente ahora, tienen el efecto que ella les atribuye. El artículo 113 se titula "Medios de Salida en Sitios de Reunión". El reglamento define los "sitios de reunión" en la siguiente forma:

"Sitios de reunión—Salones o espacios *en que se proveen asientos para cien o más personas* para fines religiosos, educacionales, recreativos, políticos, sociales, de diversión, o para el consumo de comidas o licores. Incluye también cualquier espacio ocupado que conecte los mismos, localizado en la misma planta o en las plantas superior o inferior, en los cuales la entrada es común a los salones o espacios de reunión." (Énfasis suplido.) *23 R.R.P.R., sec. 43-21.*

El inciso (b) del Art. 113, citado por la demandada, dispone, en lo pertinente, que "Los sitios de reunión deberán ser provistos de salidas en la parte de atrás de la platea que comuniquen con la sala de descanso o con un corredor que lleve a la calle. Estas salidas deberán tener una anchura no menor que la anchura total del pasillo o los pasillos que afluyan a las mismas." *23 R.R.P.R., sec. 43-823(b).*

Del examen del Reglamento de Edificación que hemos hecho surge que ese artículo 113 se aplica a los "sitios de reunión", o sea, a aquellos locales "en que se proveen asientos para 100 o más personas para fines religiosos, educacionales, recreativos, políticos, sociales, de diversión, o para el consumo de comidas o licores." En otras palabras dicho artículo se refiere a iglesias, colegios, teatros, clubes nocturnos, restaurantes, etc., y no se aplica a la oficina de un abogado. La

razón del artículo es clara; tiene como propósito facilitar la salida rápida de un gran número de personas en casos de fuego u otra emergencia. Por eso esas salidas a que alude el artículo "deberán tener una anchura no menor que la anchura total del pasillo." Ese no es tampoco nuestro caso. La puerta de la oficina del Lcdo. Licari tenía 36 pulgadas de ancho; el pasillo 13 pies y medio, en ese lugar.

Cita la demandada el artículo 125 del Reglamento de Edificación. Este artículo aparece bajo una subdivisión del Reglamento titulada "Otros Medios de Salida." En lo pertinente este artículo dispone:

"Las puertas de salida que abran a una calle o a un espacio que comunique a una calle, y que constituyan la salida requerida *para más de 40 personas* deberán abrir en dirección de la salida; pero esta disposición no se interpretará en el sentido de prohibir el uso de puertas corredizas en establos, garages o espacios de embarque o recibo de edificios comerciales o para almacenar.

"Todas las puertas de salida en locales ocupados *por 40 personas o más* y todas las puertas de salida *en sitios de reunión* deberán abrir en dirección a la salida." (Énfasis suplido.) *23 R.R.P.R., sec. 43–882.*

Puede verse que las disposiciones arriba transcritas son de aplicación a (1) espacios "que constituyan la salida requerida para más de 40 personas", (2) a "locales ocupados por 40 personas o más", y (3) a las puertas de salida de "sitios de reunión", o sea, lugares en que se proveen asientos para 100 o más personas. Tampoco es de aplicación este artículo 125 al bufete de un abogado.

Alega también la demandada que la puerta en cuestión tiene que abrir hacia afuera por exigírselo así determinados artículos que cita de las "Reglas y Reglamentos Para la Prevención de Incendios" del Servicio de Bomberos de Puerto Rico. Estas reglas estaban en vigor cuando se aprobaron los planos del edificio. Fueron aprobadas en el 1946 y, como se podrá apreciar de su texto, parecen en parte precursoras del vigente Reglamento de Edificación. Los artículos que la

demandada cita de estas reglas son el Art. 11 (a) del Título I y el Art. II (d) del Título II, texto publicado por el entonces llamado Servicio Insular de Bomberos de Puerto Rico, sin fecha, pero que dice haber sido aprobado por el Gobernador el 10 de mayo de 1946 (Exhibit B de la demandada.) [1]

La referencia que hace la demandada al Art. 11 (a) del Título I de esas Reglas debe ser un error porque ese inciso solamente dispone que queda prohibido tener líquidos inflamables en un teatro. Suponemos que la demandada quiso referirse al Artículo VI de ese Título I que trata de puertas de salida. Veamos esas dos disposiciones de las Reglas y Reglamentos del Servicio de Bomberos.

El Título I trata sobre teatros y no tiene aplicación alguna a oficinas de profesionales. Por eso el Art. VI de ese Título y el cual trata de puertas de salida de teatros no arroja ninguna luz sobre este caso. Otros artículos de dicho Título I (Teatros) tratan de asientos o butacas, casetas de proyección, escenario, cuartos de vestir, etc.

El otro artículo de estas Reglas del Servicio de Bomberos, citado por la demandada, el Art. II (d) del Título II tampoco se aplica a casos como el presente. El Título II mencionado trata de "Sitios de Reunión", los cuales define en su Art. I como sigue:

"Sitios de Reunión. Bajo la clasificación de "sitios de reunión" estarán incluidos todos los edificios o partes de edificios usados por grupos de personas *para diversión o recreo,* incluyendo todos los sitios donde se reunen personas, *tales como salones de baile, hoteles, restaurantes, clubs nocturnos, cantinas, etc.*" (Énfasis suplido.) [2]

El Art. II (d) de ese Título II (Sitios de Reunión) trata de "puertas de escape". El artículo anterior define lo que se entenderá por "puerta de escape" y al efecto dice que tal

---

[1] Los reglamentos vigentes del Servicio de Bomberos de Puerto Rico se encuentran en *25 R.R.P.R., sec. 314-1 y siguientes.*

[2] La disposición vigente es sustancialmente igual. V. *25 R.R.P.R., sec. 314-21.*

frase significa "la puerta, o cualquier otra abertura a través de la cual se puede salir libremente *de un sitio de reunión* a una calle o a un patio que se comunique con una calle." (Énfasis suplido.) Art. I(*b*) (³) El citado artículo II(*d*) dispone:

"Todas las puertas de escape en salones ocupados por más de 50 personas y todas las puertas que conduzcan hacia puertas de escape, serán colocadas en forma que abran hacia afuera, o hacia la parte donde se encuentre la salida, pero esta medida no se interpretará en el sentido de prohibir que funcionen hacia ambos lados." (⁴)

Las citadas disposiciones de las Reglas y Reglamentos del Servicio de Bomberos se refieren a teatros y a "sitios de reunión" y tampoco son aplicables a oficinas de profesionales.

█ No encontramos mérito en la alegación de que el "Código Nacional de Construcción" exigía a la demandada el tener esa puerta abriendo hacia afuera. Dicho código ("National Building Code") no es ni ley ni reglamentación oficial del gobierno; es un manual o proyecto de código de construcción que propone una junta de compañías por acciones de seguros contra incendios, que es una entidad privada y que se llama a sí misma "National Board of Fire Underwriters". Por muy respetable que sea dicho proyecto de código de construcción el mismo no tiene fuerza de ley. Además, la parte pertinente de dicho "código" leída por el perito de la demandada en el juicio, alude a puertas de salida para más de 40 personas. Se ve que el requisito de que las puertas abran hacia afuera es para casos de sitios de reunión, o sea, locales adonde concurre un grupo grande de gente, tales como salones de baile, restaurantes, clubes nocturnos, etc., y no para oficinas de profesionales como la de este caso.

Otra argumentación que presenta la demandada es que el Negociado de Permisos aprobó los planos del edificio y que dichos planos muestran las puertas de la primera planta

---

(³)La disposición vigente es idéntica. V. *25 R.R.P.R., sec. 314-21 (b)*.
(⁴)La disposición vigente es idéntica. V. *25 R.R.P.R., sec. 314-22 (d)*.

abriendo hacia el pasillo. Como hemos indicado antes, el perito de la demandada, Sr. Héctor Deliz, era el Oficial de Permisos cuando se aprobaron los planos. Declaró que para esa fecha no existía en Puerto Rico un código de construcción pero que sí existía el reglamento del Servicio de Bomberos, el cual contiene, dijo, muchas normas tomadas del "Código Nacional de Construcción." Hizo especial énfasis en "específicamente esa parte conocida por todo el mundo que dice que en los sitios públicos de reunión, teatros y sitios donde se aglomeran personas, las puertas de salida . . . deben abrir hacia afuera y que no tengan obstáculos alguno de rejilla, reja o cualquier otro artefacto que impida la libre apertura de la puerta hacia el exterior." A la luz de esa explicación es significativo señalar que el reglamento del Servicio de Bomberos al tratar de las puertas de salida de los *teatros* dispone que "Ninguna puerta que dé acceso al público, (ventana o cualquier otra abertura) en cualquier piso será obstruida por barras de metal, cadenas, enrejados o tela metálica." Haciendo más claro lo que tenía en mente el perito a renglón seguido él usó como ejemplo un teatro.

Como no existía reglamentación al efecto de que una puerta de un bufete de abogado debía abrir para afuera el Negociado de Permisos ni lo exigió ni podía exigirlo; como no había reglamentación que lo prohibiese tampoco lo prohibió ni podía prohibirlo. Por eso, cumpliendo el plano (presumiblemente) con las exigencias de ley existentes a la fecha en que se aprobó, correspondía al Negociado de Permisos aprobarlo y así lo hizo. La aprobación del Negociado de Permisos significa que el plano aprobado cumple con los requisitos mínimos que exige la ley (y la reglamentación hecha por autoridad de ley) pero en modo alguno es una capa de inmunidad contra responsabilidad civil. *Girard* v. *Fine*, 85 N.Y.S. 2d. 418, 419 (1948). En este caso, que también trata de una puerta, se dijo que el hecho de haberse cumplido con los requisitos del código de construcción y de ha-

berse obtenido el permiso para construir no absolvía al demandado de su deber de proveer una forma segura de entrar y salir del edificio.

Llegamos a la parte final del análisis de este asunto. ¿Incurrieron los demandados (la arrendadora y el inquilino) en responsabilidad bajo el artículo 1802 de nuestro Código Civil, o debe quedar sin reparación el daño causado a la demandante sin que mediara culpa de ésta y mientras la misma ejecutaba una actividad lícita?

■ Una puerta *per se* no es un artefacto intrínsecamente peligroso. Los tribunales generalmente han rehusado conceder compensación por daños sufridos por personas cuando la puerta está bien construida y en buen funcionamiento y cuando el perjudicado se ha causado el daño al utilizar la puerta, esto es, mientras entraba o salía de algún local. En esos casos se exige al transeúnte el debido cuidado al pasar por la puerta y al manejarla. *16 A.L.R. 2d. 1166.* Tampoco se ha encontrado incurso en responsabilidad al dueño del edificio cuando un tercero ha soltado descuidadamente una hoja de una puerta batiente (*swinging door*) y le ha causado daño a la persona que le seguía. Esas puertas, se ha dicho, son de uso común en locales comerciales y es de esperarse que las personas que las utilizan ejerzan el cuidado necesario. *Ibid 1176.*

■ Sin embargo la regla varía cuando se trata de puertas que abren hacia pasillos o corredores y escaleras y el perjudicado no entraba o salía por la puerta sino que caminaba por el pasillo o escalera en el momento de ser estropeado por la puerta. En esos casos la jurisprudencia sostiene que compete al juzgador evaluar los hechos y determinar si una puerta así construida es peligrosa *per se* y si el dueño del edificio es responsable o no de los daños que la misma pueda ocasionar. *Ford* v. *John Wanamaker,* 150 N.Y.S. 795 (1914); *Campbell* v. *Hughes Provision Co.,* 90 N.E.2d 694 (1950); *Paine* v. *Armour & Co.,* 80 N.E. 500 (1907); *Mc Dermott*

v. *Sallaway*, 85 N.E. 422 (1908); *Buscemi* v. *Chefford*, 8
N.Y.S.2d 578 (1938); *President & Directors of Georgetown
College* v. *Hughes*, 130 F.2d 810 (1942); *Zeder* v. *Church*,
88 N.Y.S.2d 617 (1949); *Morelock* v. *De Graw*, 112 S.W.2d
126 (1937); 16 A.L.R. 1171–1172. En esos casos la regla
varía porque la situación es distinta. La persona que ha de
resultar perjudicada va caminando con el cuidado necesario
cuando es estropeada por un objeto que súbitamente y sin
aviso sale hacia su paso, lo cual ella no puede prevenir. En
estas circunstancias el tener esa puerta funcionando de ma-
nera que al ser utilizada en forma normal pueda estropear
a personas que van caminando con el cuidado ordinario por
un pasillo o una escalera, constituye falta del cuidado debido
al público y acarrea responsabilidad. *President and Direc-
tors of Georgetown College* v. *Hughes*, supra; *Morelock* v.
*De Graw*, supra; 16 A.L.R.2d 1171.

■ Los casos de *Goose* v. *Hilton*, 79 D.P.R. 523 (1956) y
de *Muñoz* v. *R. Fabián & Co.*, 71 D.P.R. 485 (1950) citados
por la demandada en su alegato, no son aplicables porque
en ellos se trata de situaciones distintas a la que aquí conside-
ramos. Es cierto que en *Goose* v. *Hilton* se dijo que "no hay
obligación de proteger al visitante contra peligros *que le son
conocidos, o que son tan aparentes que puede razonablemente
esperarse que los descubra*", pero en ese caso se trataba de
una escalera. La existencia de una escalera por donde una
persona ha de transitar es aparente y obvia y también es de
esperarse que las personas ejerzan prudencia y cuidado al
subir o bajar escaleras. También se dijo en este caso de
*Goose* v. *Hilton* que el visitante tiene derecho "a suponer que
se ha ejercido el cuidado debido para que el local sea seguro
para él, y no viene obligado . . . a estar a la expectativa para
descubrir posibles defectos". Este caso cae dentro de esta
segunda alternativa; la demandante al caminar por el pa-
sillo si bien estaba obligada a notar escaleras u otros peligros
aparentes que hubiese habido en el pasillo, no estaba obligada

a estar a la expectativa y prevenir que un objeto salido del piso, del techo o de las paredes, súbitamente la estropease. El otro caso citado de *Muñoz* v. *R. Fabián,* supra, trata de un escalón que había en el piso de un corredor y por lo tanto se concluyó que la persona que por allí transitaba tenía la obligación de percatarse del escalón y de ejercer el debido cuidado. En estos casos de escaleras, salvo circunstancias especiales, el dueño del edificio no es responsable porque, como se dijo antes, son peligros aparentes y obvios y las personas que por ellas transitan deben hacerlo con prudencia.

Habiendo considerado el derecho aplicable regresemos a nuestro caso. Se trata de un pasillo central en la primera planta de un edificio de doce pisos, en el cual a la fecha de autos vivían 312 familias que comprendían, en la opinión del administrador del edificio, alrededor de 500 personas y en cuya primera planta y a ambos lados del pasillo central hay una serie de locales comerciales, de los cuales para la fecha de los hechos había nueve ocupados. Para esa fecha entre los negocios allí establecidos había una farmacia, un salón de belleza y un restaurante.

Aunque es de suponer que no todos los residentes permanentes del edificio utilizan ese pasillo ya que los que llegan en automóvil utilizan el ascensor o la entrada de la parte de atrás del edificio, sin embargo alguna parte de dichos residentes utilizará con frecuencia el pasillo central para salir hacia la calle para tomar taxímetros, autobuses, etc. Por otro lado, gran parte de las personas que trabajan en los locales comerciales de la primera planta y muchos de sus clientes y visitantes utilizan dicho pasillo central. El propio perito de la demandada declaró durante el contrainterrogatorio que en ciertas horas un número grande de personas coinciden en su tránsito por el pasillo; como 50 personas, dijo, y añadió que esas aglomeraciones a esas horas él personalmente las había visto.

■ La puerta que causó el accidente, la de la oficina del abogado Licari, abría hacia afuera porque así la construyó y

la mantuvo el dueño y arrendador y sin que hubiese reglamentación oficial que así lo exigiese o que lo prohibiese. Como hemos visto el mero permiso de construcción o de uso no inmuniza contra responsabilidad bajo el Artículo 1802. Un pasillo que dá acceso a tan crecido número de personas, por el cual pueden transitar desde algunas docenas de personas durante un día de poco movimiento hasta varios centenares durante un día de mucho movimiento y que tiene puertas que pueden abrirse hacia afuera sin aviso, y sin protección alguna para el que transita por el pasillo, y sin que así abran por requisito específico de ley o de reglamentación, constituye un riesgo indebido para los transeúntes. Poca reflexión es necesaria para ver que existe la probabilidad, y no la mera posibilidad, de que ha de ocurrir el momento en que han de coincidir en el espacio el filo de una puerta y la cabeza de un ser humano. Tal riesgo constituye la negligencia que puede causar daño a otro y el cual hay la obligación de reparar. No olvidamos que los locales definidos por los reglamentos oficiales como sitios de reunión vienen obligados a tener sus puertas abriendo hacia afuera. Puede arguirse que ésto también constituye un riesgo para el transeúnte. Posiblemente así es, pero en estos casos contrapesa con creces ese argumento la conveniencia de que esas puertas abran con facilidad y hacia afuera para evitar que en casos de siniestros centenares de personas mueran. En estos casos de sitios de reunión se plantea la situación frecuente en que hay varios intereses encontrados y el legislador al formular la política pública se ve en la necesidad de escoger aquella solución más conveniente o más útil para el público en general. A veces la solución que racionalmente tiene que proveerse por ser la mejor para la comunidad en general puede resultar incómoda o gravosa para algunos de sus miembros, pero éste es un precio razonable que se paga para disfrutar de la vida pacífica y civilizada. En ausencia de estos ajustes

la vida humana se parecería bastante al cuadro poco deseable que describió Tomás Hobbes, en donde cada ser humano estaría en perenne lucha contra sus semejantes, y en donde la vida del hombre resultaría corta y brutal.(5)

Concurrimos con el juez sentenciador en que hay responsabilidad de parte de la demandada San Juan Darlington Inc. y en que no la hay de parte del inquilino Licari. Este, al ocurrir el accidente, ejercía una actividad lícita, abrir la puerta de su oficina, actividad que de ordinario no pone en riesgo el bienestar de terceras personas. Como se ha señalado antes, la demandante no estaba dentro de la oficina del Licenciado Licari y ni entraba ni salía de la misma. Tampoco incurrió en negligencia el inquilino al tener una cortina por el lado interior de su oficina pues quien arrienda un local que tiene puertas y paredes de cristal no viene obligado a vivir o a trabajar en una vitrina.

El tercero y último error señalado por la demandada consiste en alegar que la compensación es desproporcionada y en que se erró en imponerle al apelante el pago de honorarios de abogado. En casos de daños y perjuicios, la fijación del monto de la indemnización descansa en la sana discreción del tribunal sentenciador y el mismo no debe alterarse a menos que sea manifiestamente erróneo o exagerado. *Sociedad Gananciales, etc.* v. *Cruz*, 78 D.P.R. 349 (1955); *Dávila* v. *Autoridad de Tierras*, 78 D.P.R. 859 (1955); *Baralt* v. *Báez*, 78 D.P.R. 123 (1955); *Prado* v. *Quiñones*, 78 D.P.R. 322 (1955); *Goose* v. *Hilton Hotels*, 79 D.P.R. 523 (1956). Por entender que este aspecto de la sentencia del tribunal sentenciador no es manifiestamente errónea ni exagerada la confirmamos. En cuanto a la imposición de honorarios de abogado opinamos que tiene razón la demandada ya que no creemos que constituya temeridad defenderse de una demanda por $52,000 en circunstancias como la de este caso

---

(5) Leviathan (1651).

en que determinar el derecho aplicable podía ser objeto de honesta discrepancia.

Lo que hemos dicho anteriormente dispone de la apelación de la demandante que imputaba error al tribunal sentenciador al declarar sin lugar la demanda en cuanto al demandado Licari.

*Se modifica la sentencia apelada dictada por el Tribunal Superior, Sala de San Juan, en 22 de mayo de 1957 en el sentido de suprimir la imposición de honorarios de abogado, y así modificada se confirmará.*