José Manuel Colón Miranda y otros, demandantes y recurridos, *v.* Plaza Las Américas, Inc. y otros, demandados y recurrentes.

*Número:* RE-90-196          *Resuelto:* 1ro de junio de 1994

*Pedro Toledo González*, abogado de los demandados y recurrentes; *José A. Rodríguez Jiménez*, abogado de los demandantes y recurridos.

## SENTENCIA

Expedimos el presente recurso con el propósito de revisar, más a fondo, una sentencia emitida por el Tribunal Superior de Puerto Rico, Sala de San Juan, mediante la cual dicho foro judicial le impuso responsabilidad a la codemandada Plaza Las Américas, Inc., y su compañía ase-

---

guradora Eagle Star Insurance Co. of Puerto Rico, en relación con una caída que sufriera el codemandante José Gil Colón Rodríguez mientras caminaba por uno de los pasillos, o área común, del centro comercial conocido como Plaza Las Américas.

Luego de revisar con detenimiento tanto la transcripción de evidencia como los alegatos de las partes, hemos llegado a la conclusión que en el presente caso están presentes los tres (3) requisitos que tienen que concurrir para que prospere una acción de daños y perjuicios bajo el Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, a saber: ocurrencia de un daño; un acto u omisión culposo y negligente por parte del demandado; y relación causal entre el daño sufrido por la parte demandante y la acción u omisión culposa y negligente de la parte demandada. *Hernández v. Fournier*, 80 D.P.R. 93, 96 (1957).

Esto es, y conforme lo resuelto por este Tribunal en *Cotto v. C.M. Ins. Co.*, 116 D.P.R. 644 (1985), entendemos, y así lo resolvemos, que a la luz de los hechos particulares del presente caso, la parte demandada responde por los daños sufridos por el codemandante Colón Rodríguez como consecuencia de la caída que éste sufriera en el mencionado centro comercial; caída causada por una condición de peligrosidad que la parte demandada permitió que subsistiera por un período de tiempo irrazonable en los predios del referido centro comercial.

Por los fundamentos antes expuestos, *se dicta Sentencia confirmatoria de la emitida por el Tribunal Superior de Puerto Rico, Sala de San Juan; devolviéndose el caso a dicho foro judicial para procedimientos ulteriores consistentes con lo aquí resuelto.*

Así lo pronunció, manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Fuster Berlingeri emitió un voto de conformidad, al cual se unió la Juez Asociada Señora Naveira de Rodón. El Juez Asociado Se-

ñor Rebollo López emitió una opinión disidente, a la cual se unió el Juez Presidente Señor Andréu García. El Juez Asociado Señor Hernández Denton disintió "por entender que en el caso de autos no quedó probado que Plaza Las Américas fue negligente".

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Voto de conformidad emitido por el Juez Asociado Señor Fuster Berlingeri, al cual se une la Juez Asociada Señora Naveira de Rodón.

El caso ante nos presenta, desde el punto de vista normativo, una situación bastante ordinaria en lo que al derecho de daños y perjuicios se refiere. Propiamente hablando no es un caso novel que requiera formular pautas o pronunciamientos jurídicos para ampliar o añadir elementos a las doctrinas vigentes.

Lo anterior no obstante, al aplicar los conocidos principios de responsabilidad civil a la situación de hechos concretos del caso, es menester ponderar y sopesar cuidadosamente un asunto que es particularmente determinativo de la acción instada, y que amerita, además, que se formulen unas breves expresiones por escrito en torno a éste.

El asunto en cuestión es determinar si la parte demandada actuó razonablemente a tiempo para eliminar del centro comercial en cuestión la condición de peligrosidad que causó la caída del demandante y, por ende, los daños que sufrió.

Según los hechos esenciales probados, el demandante resbaló al pisar los residuos de un helado derretido que estaba desparramado sobre una porción del suelo del área del centro comercial donde ocurrió el accidente. Luego de la caída, el demandante se levantó del piso con la ayuda de

un amigo que lo acompañaba. Entonces ambos examinaron el lugar para determinar qué había provocado la caída. Observaron el helado derretido y otras circunstancias del sitio, y concluyeron que había sido la esponjosa substancia del licuado helado lo que dio lugar a que el demandante se resbalara. Después de realizar este examen, el amigo del demandante fue a buscar ayuda y realizó gestiones pertinentes a ese fin por espacio de diez a quince minutos. Luego de hacer dichas gestiones, el amigo regresó al lugar del accidente. No encontró al demandante allí, pero *pudo observar que los residuos del helado permanecían todavía en el suelo y no habían sido eliminados.*[1]

Frente a este cuadro de hechos, la cuestión jurídica particularmente decisiva de la acción instada es determinar si los responsables de ello en el centro comercial fueron negligentes al no limpiar el piso a tiempo y así evitar la caída del demandante. Es decir, la controversia esencialmente gira en torno a la cuestión de si la parte demandada tenía instalado en su negocio un sistema continuo de limpieza y mantenimiento que fuese adecuado.

No cabe duda de que no puede exigírsele a un establecimiento comercial que elimine tan pronto ocurra, o aun pocos de minutos después, una condición peligrosa que suceda de imprevisto en sus áreas comunes, causada casualmente por alguna de las numerosas personas que frecuentan dicho establecimiento. Lo que sí puede razonablemente requerírsele es que tenga un medio expedito para enterarse de tales condiciones y para luego corregirlas con prontitud.

El tiempo jurídicamente requerido para eliminar la condición peligrosa debe ser más o menos el mismo en cualquier establecimiento comercial. Ello significa que mientras más grande sea el negocio, mayores deben ser los *recursos* que sus responsables deben dedicar a procurar razonablemente la seguridad de sus clientes.

---

[1] T.E., pág. 49.

¿Existía en este caso el aludido sistema de limpieza y mantenimiento? Es decir, ¿un sistema que fuese adecuado? La parte demandada presentó prueba en instancia de que tenía *siete* empleados de mantenimiento para velar por la continua limpieza de dos pisos del más grande centro comercial del país, Plaza Las Américas. También presentó testimonio a los efectos de que uno de estos empleados debía pasar generalmente cada quince minutos por el área donde ocurrió el accidente. Finalmente, alegó la parte demandada que este "sistema" de siete empleados que dan servicio a determinadas áreas cada quince minutos era razonablemente suficiente para procurar la seguridad de sus clientes en este centro comercial.

La parte demandada basó su defensa —en cuanto al asunto que nos interesa aquí— esencialmente en lo antes reseñado. No justificó de modo satisfactorio alguno, porque entendía que el aludido sistema de vigilancia y limpieza era suficiente. No presentó elementos de juicio fundamentados en criterios comparativos o basados en conocimientos especializados sobre la materia, que persuasivamente demostraran que el sistema que tenía instalado allí era realmente adecuado. Intuitivamente parecería más bien que tal sistema de mantenimiento *no era suficiente*, si se consideran los enormes espacios incluidos en las áreas de responsabilidad de dichos empleados y las miles de personas que cotidianamente las frecuentan.

Por otro lado, los planteamientos aludidos de la parte demandada no son convincentes, visto el hecho de que aun luego de haberse derramado el helado que causó el accidente, y después de haber ocurrido dicho accidente, transcurrieron otros lapsos de tiempo mientras que el amigo de la víctima fue a buscar ayuda para ésta, y en lo que regresó al lugar de los hechos, y los residuos del helado todavía permanecían en el piso. Habían transcurrido, en efecto, mucho más de quince minutos desde que se derramó el helado y aún éste no había sido eliminado del piso.

En resumen, pues, tenemos dudas tanto en cuanto a la razonabilidad como en cuanto a la operación del sistema de mantenimiento que alegadamente existía en Plaza Las Américas al momento del accidente de marras; dudas suficientemente serias como para impedirnos intervenir con el dictamen de negligencia del tribunal de instancia que aquilató la prueba. No se nos ha convencido de que el curso más justo a seguir sea revocar dicho dictamen.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Presidente Señor Andréu García.

El 24 de agosto de 1987, alrededor de las dos de la tarde, y luego de asistir a sus clases en la Universidad de Puerto Rico, el Sr. José Gil Colón Rodríguez[1] se dirigió al centro comercial Plaza Las Américas en Hato Rey, acompañado por su amigo el Sr. Juan Noriega Sotolongo; ello con el propósito de comprar un traje de baño con los colores representativos de la Universidad de Puerto Rico.[2] Luego de visitar varios de los comercios allí establecidos sin encontrar el mencionado artículo, y estando en la tienda Sears, decidieron dirigirse a JC Penney. Encontrándose en el segundo piso de Sears, ambos tomaron la salida que conecta con el pasillo central del segundo piso del mencionado Centro Comercial para así dirigirse a su destino. Estos —mientras conversaban— cogieron el pasillo común del lado derecho y pasaron por el área de las escaleras mecánicas que comunican los pisos segundo y tercero del

---

[1] El Sr. José Gil Colón Rodríguez, al momento de los hechos, tenía veinte (20) años de edad y cursaba estudios universitarios en la Universidad de Puerto Rico. Son sus padres José Manuel Colón Miranda y Eugenia Rodríguez, con quienes reside en Bayamón.

[2] El traje de baño era para ser utilizado por el Señor Colón Rodríguez en las pruebas (*try outs*) para formar parte del equipo de polo acuático de la Universidad de Puerto Rico. T.E., pág.65.

referido Centro Comercial. En el instante en que pasaban por el lado del directorio ubicado en el pasillo antes mencionado —cerca de la tienda de chocolates y golosinas "Magritte"— Colón Rodríguez resbaló súbitamente, cayendo de espaldas al piso, y recibiendo fuertes golpes en la espalda, en la cabeza y en el hombro izquierdo. Mientras caía, Colón Rodríguez trató de agarrarse del referido directorio, pero su esfuerzo fue en vano.

Luego de la caída, su acompañante Noriega, lo ayudó a levantarse y a incorporarse; *ambos pudieron observar, y concluyeron que Colón Rodríguez había resbalado en los residuos de un helado derretido que se encontraba en el piso.*(³) Además, había en el suelo un envase plástico trasparente de alrededor de seis (6) a ocho (8) pulgadas y un "utensilio", presumiblemente utilizado para ingerir el helado. Según el testimonio del propio Colón Rodríguez, el helado, el envase y el utensilio *ocupaban un área total de dos (2) pies con dos (2) pulgadas.* T.E., págs. 110–111.

Noriega —percatándose de la condición de su amigo— decidió ir a buscar ayuda; mientras tanto, Colón Rodríguez permaneció en el sitio del accidente. El proceso de hacer las referidas gestiones le tomó a Noriega aproximadamente de unos diez (10) a quince (15) minutos. Luego de dichos trámites, Noriega regresó al área del Centro Comercial donde había dejado a Colón Rodríguez; éste ya no se encontraba allí. Noriega se marchó del referido Centro Comercial; posteriormente se enteró de que Colón Rodríguez no se encontraba en el lugar de los hechos, debido a que había sido llevado a la caseta de seguridad de Plaza Las

---

(³) Según el testimonio de Colón Rodríguez, éste describió las condiciones del mantecado como que estaba en un estado semi-sólido como con la consistencia de un *pancake* (T.E., pág. 68); "como si se estuviera secando...[d]esde afuera hacia adentro. Primero las orillas y luego la parte central" (T.E., pág. 69); se veía de "color 'brown'. Y, además, ésta parte de adentro como una nata, una nata un poco más suave" (T.E ., pág. 70) y "la consistencia no era líquida, se estaba tornando..., era una consistencia esponjosa, esa es la palabra, y había adquirido un color más oscuro al que tenía el resto de la nata que ya le dije que ..." (T.E., pág. 71).

Américas y de allí al hospital a recibir tratamiento por sus lesiones.

Colón Rodríguez fue trasladado al Dispensario de Puerto Nuevo y, luego, al Hospital Hermanos Meléndez de Bayamón. Allí se le tomaron radiografías y se le diagnosticó que había sufrido, a consecuencia de la caída, una dislocación del hombro izquierdo. Con posterioridad al accidente, el hombro comenzó a dislocarse en forma espontánea y desarrolló, según la prueba presentada, una dislocación recurrente multidireccional que se ha hecho habitual.(⁴) T.E., págs. 8–9.

El 2 de marzo de 1988, Colón Rodríguez, y sus padres, radicaron acción en daños y perjuicios(⁵) ante el Tribunal Superior, Sala de San Juan, contra Plaza Las Américas, Inc.,(⁶) y su aseguradora Eagle Star Insurance Company of Puerto Rico.(⁷) La parte demandada contestó la demanda negando la ocurrencia del accidente por falta de información, y por ende, responsabilidad por la alegada caída. Los

---

(⁴) En otras palabras, el hombro de Colón Rodríguez se puede dislocar en cualquier dirección que tome el hombro al hacer un movimiento. Véase determinación de hecho número diez (10) de la sentencia de instancia.

(⁵) En la demanda Colón Rodríguez alega que debido al accidente se tuvo que dar de baja del R.O.T.C.; ha tenido que suprimir toda actividad física, viéndose impedido de practicar distintos deportes; no pudo terminar el curso para tomar la licencia que lo capacitaría para trabajar como instructor de natación o salvavidas; ha perdido 35% de la fuerza del brazo y ha sufrido angustias por las operaciones, por todo lo cual reclamó la suma de doscientos mil dólares ($200,000).

A su vez, alegó que no pudo seguir con su trabajo en Pueblo Xtra ya que no puede utilizar su brazo izquierdo en ninguna actividad que conlleve fuerza física. Por este concepto reclamó una pérdida de ingresos pasada de dos mil seiscientos dólares ($2,600) y futura en no menos de cincuenta mil dólares ($50,000).

Alegó también que sus padres y su hermana han sufrido angustias y sufrimientos ante la condición incapacitante de éste, por lo cual reclamaron cincuenta mil dólares ($50,000) para cada uno de los padres y veinte mil dólares ($20,000) para su hermana.

(⁶) Plaza Las Américas, Inc., es una corporación debidamente organizada en Puerto Rico haciendo negocios y operando un complejo comercial en Hato Rey bajo ese mismo nombre. Véase determinación de hecho número dos (2) de la sentencia de instancia.

(⁷) Eagle Star Insurance Company of Puerto Rico es una compañía de seguros que para la fecha de los hechos había expedido una póliza a favor de Plaza Las Américas, Inc. para cubrir riesgos y daños como los alegados en este caso. Véase determinación de hecho número tres (3) de la sentencia de instancia.

días 18 de abril y 31 de octubre de 1989 se celebró la vista en su fondo del caso, quedando el caso sometido para resolución del tribunal.([8])

El 22 de diciembre de 1989, el tribunal de instancia dictó sentencia declarando con lugar la demanda. Concluyó que Plaza Las Américas fue negligente, imputándole conocimiento de la condición peligrosa existente el día de los hechos.([9]) El 23 de marzo de 1989, los demandados instaron recurso de revisión ante este Tribunal imputándole al tribunal de instancia haber errado al así resolver. El 19 de abril de 1990 decidimos expedir.

En el día de hoy una mayoría de los integrantes del Tribunal *confirma* la sentencia recurrida. *Disentimos; veamos por qué.*

## I

El Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141, enuncia la norma genérica que prohíbe causar daño a otro mediante conducta activa o pasiva. *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94, 105 (1986).([10]) Dicho artículo de ley establece que "[e]l que por acción u omisión

---

([8]) La prueba presentada por la parte demandante consistió del testimonio pericial de los doctores Juan Llompart y William Micheo; el testimonio del Sr. Juan Noriega Sotolongo, acompañante de Colón Rodríguez el día de los hechos; el testimonio del propio Colón Rodríguez; y el testimonio de sus padres, a saber, Sr. José Colón Miranda y Sra. Eugenia Rodríguez Ramírez.

Por su parte, la prueba presentada por la parte demandada consistió del testimonio del Sr. Raúl Chávez Hernández, Supervisor de Mantenimiento de Plaza Las Américas.

([9]) En la sentencia de instancia se le otorgó a la parte demandante la cantidad de cuarenta y siete mil dólares ($47,000), la cual se desglosó como sigue: trece mil dólares ($13,000) por limitaciones e incapacidad; once mil dólares ($11,000) por daños incluyendo cicatriz, dislocación, terapia y tratamiento; nueve mil dólares ($9,000) por angustias y sufrimientos mentales, molestias e inconvenientes al verse privado de practicar deportes y de pertenecer al R.O.T.C.; tres mil quinientos dólares ($3,500) por angustias y sufrimientos de los padres; dos mil quinientos dólares ($2,500) por gastos médicos incluyendo la operación que será necesaria; siete mil dólares ($7,000) por ingresos dejados de percibir y mil dólares ($1,000) de honorarios de abogado.

([10]) Véanse, en adición: *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 17–18 (1987); *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305, 313 (1970).  ·

causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". Art. 1802, ante. Para que prospere una acción de daños y perjuicios, bajo el citado Art. 1802, deben concurrir tres requisitos, a saber: (1) realidad del *daño* sufrido; (2) un acto u omisión *culposo o negligente*, y (3) *nexo* causal entre el daño y la referida acción u omisión culposa o negligente de la otra parte. *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 D.P.R. 785 (1993); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Soc. Gananciales v. G. Padín Co., Inc.*, ante, pág. 106; *Hernández v. Fournier*, 80 D.P.R. 93, 96 (1957).

Los factores a considerarse, para determinar si una omisión genera responsabilidad bajo el Art. 1802, son: (1) existencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituiría la "antijuricidad", y (2) si de haberse realizado el acto, se hubiera evitado el daño. *Soc. Gananciales v. G. Padín Co., Inc.*, ante, pág. 106. De estos factores surge el deber de previsibilidad[11] ya que "el Art. 1802 gira inevitablemente en torno a la función de previsión del individuo, como factor determinante de su responsabilidad con su congénere". (Énfasis suprimido.) *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 18 (1987). "Claro está, esto no quiere decir, que la persona esté obligada a prever todos los posibles riesgos que puedan concebirse en una determinada situación, pues prácticamente se convertirá entonces en una responsabilidad absoluta." *Pacheco v. A.F.F.*, 112 D.P.R. 296, 300 (1982).[12] "El deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad ... sino a aquel ... que llevaría a una persona prudente a anticiparlo." *Hernández v. La Capital*, 81 D.P.R. 1031, 1038 (1960).

---

[11] En *Salvá Matos v. A. Díaz Const. Corp.*, 95 D.P.R. 902, 906 (1968), definimos la previsibilidad como el elemento característico de la culpa, consistente en la posibilidad de prever los resultados dañosos de la acción no previstos de modo efectivo en el caso de que se trate.

[12] Véase en adición *Rivera Pérez v. Cruz Corchado*, ante, pág. 19.

Bajo los mencionados parámetros es que surge el deber de cuidado que tiene que observar un operador de un establecimiento comercial. En el *normativo* caso de *Cotto v. C.M. Ins. Co.*, 116 D.P.R. 644, 650 (1985), señalamos que:

> No hay duda de que una persona o empresa que opera un establecimiento abierto al público con el objeto de llevar a cabo operaciones comerciales para su propio beneficio debe hacer lo posible por mantener dicho establecimiento en condiciones tales de seguridad que los clientes que patrocinan el mismo no sufran ningún daño; en otras palabras, corresponde al dueño de un negocio o al propietario del mismo mantener el área a la que tienen acceso sus clientes como un sitio seguro. A esos efectos, véanse: *Gutiérrez v. Bahr*, 78 D.P.R. 473 (1955); *Goose v. Hilton Hotels*, 79 D.P.R. 523 (1956); *Santaella Negrón v. Licari*, 83 D.P.R. 887 (1961); *Weber v. Mejías*, 85 D.P.R. 76 (1962), y *Aponte Betancourt v. Meléndez*, 87 D.P.R. 652 (1963). Deberá observarse, sin embargo, que —como expresáramos en *Goose v. Hilton Hotels*, ante, págs. 527–528— el dueño del establecimiento "no es un asegurador de la seguridad de los clientes del negocio, y su deber sólo se extiende al ejercicio del cuidado razonable para su protección" y que el visitante tiene que probar que el dueño del establecimiento no "ha ejercido el cuidado debido para que el local sea seguro para él". En los casos antes citados impusimos responsabilidad por cuanto los mismos envolvían condiciones peligrosas existentes dentro de los establecimientos correspondientes, *las cuales eran de conocimiento de los propietarios o su conocimiento podía imputárseles a éstos*". (Énfasis suplido.)

En relación específica a caídas en establecimientos comerciales, establecimos en el citado caso de *Cotto v. C.M. Ins. Co.*, ante, pág. 651, que:

> Un análisis de nuestra jurisprudencia referente a la situación específica de reclamaciones por caídas revela que hemos exigido de la parte demandante que pruebe, como parte esencial de la causa de acción que ejercita, la existencia de la condición de peligrosidad que ocasionó la caída. (Énfasis suprimido.) Véanse: *Malavé v. Hosp. de la Concepción*, 100 D.P.R. 55 (1971); *González Ivankovich v. Las Amer. Prof. Ctr.*, 103 D.P.R. 89 (1974); *Maldonado v. Interamerican University*, 104 D.P.R. 420 (1975); *Weber v. Mejías*, ante; *Feliciano v. Escuela de Enfermeras*, 94 D.P.R. 535 (1967); *Torres v. Metropoli-*

*tan School*, 91 D.P.R. 1 (1964); *Ferro v. A.M.A.*, 91 D.P.R. 770 (1965), y *Goose v. Hilton Hotels*, ante.

El deber antes aludido de mantener los lugares comerciales seguros para el público que los visita aplica a los centros comerciales[13], según lo resolvimos expresamente en *J.A.D.M. v. Centro Com. Plaza Carolina*, ante, pág. 791:

> No cabe la menor duda que, con relación a los centros comerciales regionales, por la variedad de actividades que allí se llevan a cabo y el cúmulo de servicios que se ofrecen, o sea, por su naturaleza esencial, éstos están obligados a ofrecer al público que los frecuenta, cuando las circunstancias así lo ameritan, un grado de protección y seguridad, adecuado y razonable, independiente del que puedan ofrecer las agencias de seguridad pública.

A la luz de lo resuelto en *Cotto v. C.M. Ins. Co.*, ante, se desprende, *con claridad*, que para imponerle responsabilidad a un lugar comercial hay que determinar, *primeramente*, si existía una condición peligrosa y, *en segundo lugar*, si la existencia del tal condición peligrosa era del conocimiento de la parte demandada o podía imputársele a éste tal conocimiento.

Procedemos a discutir estas dos interrogantes a la luz de los hechos del caso de autos.

## II

No nos cabe la menor duda que en el pasillo central de Plaza Las Américas donde ocurrió el accidente el día de los hechos había una condición que puede catalogarse como peligrosa para los clientes de dicho Centro Comercial, a saber; mantecado derretido en el piso. Esta conclusión resulta obvia en vista del testimonio de los testigos —señor

---

[13] El Departamento de Comercio define centro comercial como una " '[s]erie de unidades comerciales independientes, físicamente separadas en un mismo edificio, pero integradas con el propósito de brindar una oferta complementaria de bienes y servicios' ". *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 D.P.R. 785, 790 (1993).

Colón Rodríguez y señor Noriega— que nos convencen de la existencia del helado derramado en el piso, *prueba que no fue controvertida por la parte demandada.*

Ahora bien, procede que determinemos, a la luz de la prueba presentada, *si la condición peligrosa era del conocimiento de Plaza Las Américas o si se le podía imputar a ésta el referido conocimiento.* En el presente caso, luego de un análisis detenido de la totalidad de la prueba vertida, somos del criterio que el tribunal de instancia *no* tuvo ante sí prueba suficiente para imponerle responsabilidad a Plaza Las Américas. Sabido es que únicamente se le impondrá responsabilidad a un demandado cuando, mediante la presentación de prueba, se ponga al tribunal en condiciones de poder hacer una determinación clara y específica sobre negligencia. *Cotto v. C.M. Ins. Co.*, ante, pág. 652. La prueba presentada por la parte demandante *tan sólo* demostró la existencia del helado derretido en el pasillo del referido centro comercial y que el demandante resbaló en dichos residuos. *Entendemos que esta prueba, por sí sola, no es suficiente para imponerle responsabilidad a la parte demandada ya que de la misma no se infiere negligencia per se de su parte.* Véanse: *Cotto v. C.M. Ins. Co.*, ante, pág. 652; *Malavé v. Hospital de la Concepción, ante; González Ivankovitch v. Las Américas Prof. Center,* ante.

En otras palabras, *la prueba presentada no nos sitúa en posición de determinar que Plaza Las Américas conocía de la condición peligrosa o de que se le podía imputar dicho conocimiento.* Al respecto, resulta pertinente lo expresado en *Baptiste v. Schwegmann Bros. Giant Supermarkets,* 338 So. 2d 1163, 1165 (1976), a los efectos de que:

...the fact that the ice cream was melted when first seen by plaintiff proves nothing as to the length of time it had been on the floor prior to plaintiff's fall. Insofar as in shown by the record, at the time plaintiff fell the ice cream could have been on the floor for a very short time or for a comparatively long time.

*Debido al gran tamaño de un centro comercial, no re-*

*sulta razonable imputarle, a las personas responsables del mismo, conocimiento de toda condición peligrosa que ocurra en las áreas comunes, y la obligación de atender y eliminar la misma, de una manera inmediata. El así hacerlo podría llevarnos a un absurdo o, cuando menos, imputarle responsabilidad absoluta a los mismos.* Acorde con este razonamiento, no podemos exigirle a este tipo de Centro Comercial que limpie o remueva, *en cuestión de segundos o minutos,* cualquier material o sustancia que los cientos, o miles, de personas que frecuentan el mismo dejen caer, o tiren, al piso en un momento determinado.[14] Dichos centros comerciales, naturalmente, sí vienen en la obligación de establecer un sistema de limpieza, y mantenimiento, *continuo y razonable.*

En estos tipos de casos, le corresponde a las partes, *en especial a la parte demandante,* poner al foro judicial en posición de —mediante, naturalmente, la presentación de prueba— poder hacer una determinación clara a los efectos antes mencionados. *En relación con el caso específico hoy ante nuestra consideración, la parte demandante no presentó prueba alguna al respecto.* La prueba ofrecida —*no rebatida*— por la parte demandada, consistente del testimonio del Sr. Raúl Chávez Hernández, Supervisor de Mantenimiento de Plaza Las Américas, nos convence de que el

---

(14) En cuanto a los establecimientos comerciales en sí, existentes en un centro comercial o de manera individual en nuestro País, el período de tiempo que se requiere que transcurra para poder imputarle el conocimiento de una condición peligrosa a los responsables de un local comercial necesariamente tendrá que basarse, entre otros factores, en el tamaño del establecimiento en controversia.

Ello así, ya que mientras más pequeño sea el local, debido al mayor grado de visibilidad y control del área, resulta más fácil y evidente para los empleados del mismo el percatarse de la advenimiento o existencia de una condición peligrosa. En consecuencia, se le puede imputar a éstos el conocimiento de la referida condición peligrosa en un período de tiempo relativamente corto.

A contrario sensu, en un establecimiento relativamente grande —donde transitan más personas y el control de las áreas y la visibilidad son más difíciles de implementar— el percatarse de una condición peligrosa puede tomar más tiempo.

sistema de mantenimiento y limpieza de Plaza Las Américas era uno adecuado y eficiente.([15]) Esto es, dicha evidencia nos ha convencido de que el sistema de mantenimiento que utilizaba Plaza Las Américas, para la fecha del accidente aquí en controversia, era uno que lo releva de responsabilidad en relación con los hechos del presente caso; sistema mediante el cual Plaza Las Américas anticipaba cualquier peligro, de la naturaleza aquí envuelta, que pudiera ocurrirle a sus patrocinadores.

En resumen, luego de un análisis desapasionado y minucioso de la prueba, somos del criterio que las determinaciones que hiciera el tribunal de instancia, sobre negligencia de la parte demandada, *no* representan el balance más racional, justiciero y jurídico de la totalidad de la evidencia que desfilara ante dicho foro, y, por lo tanto, las mismas no pueden prevalecer. *Ramos Acosta v. Caparra Dairy, Inc.*, 113 D.P.R. 357, 364 (1982).([16])

Por las razones antes expresadas, es que disentimos de la acción mayoritaria que confirma la sentencia dictada por el Tribunal Superior de Puerto Rico, Sala de San Juan, sentencia mediante la cual declaró con lugar la demanda de daños y perjuicios radicada en el presente caso.

---

([15]) El Sr. Raúl Chávez Hernández testificó que en el turno de siete (7) de la mañana a cuatro (4) de la tarde trabajan siete personas de mantenimiento en los pisos primero y segundo de Plaza Las Américas. T.E., pág. 148. El tercer piso lo atiende una compañía privada. T.E., pág. 149. Por su parte testificó que hay ciento veinticinco (125) zafacones distribuidos en los dos pisos. T.E., pág. 154. A su vez, explicó que en el área de los hechos debe pasar generalmente un empleado de limpieza o un guardia cada quince (15) minutos según el plan pre-establecido. T.E., pág. 161. También aclaró que cada empleado, de acuerdo a los pies cuadrados de ambos pisos, tiene que cubrir un promedio de diecisiete mil (17,000) pies cuadrados. T.E., págs. 158–159. El Señor Chávez testificó que entiende que el sistema de mantenimiento es adecuado. T.E., pág. 159.

([16]) Véanse, en adición: *Abudo Servera v. A.T.P.R.*, 105 D.P.R. 728 (1977); *Maryland Casualty Co. v. Quick Const. Corp.*, 90 D.P.R. 329 (1964), y *Sanabria v. Sucn. González*, 82 D.P.R. 885 (1961).