RAFAEL MALAVÉ VÉLEZ ET AL., demandantes y recurridos, *v.* HOSPITAL DE LA CONCEPCIÓN y SECURITY INSURANCE COMPANY, demandados y recurrentes.

*Número:* R-70-259      *Resuelto:* 14 de junio de 1971

*Polo, Rivera Mercado & Lasa,* y *Ulpiano Falcón Matos,* abogados de las recurrentes; *R. Elfrén Bernier* y *Plinio Pérez Marrero,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR MARTÍNEZ MUÑOZ emitió la opinión del Tribunal.

◼ Hemos examinado con detenimiento los autos originales del caso. Le hemos dado debida consideración a los alegatos y a los informes orales de las partes y dedicado tiempo considerable a la lectura de la transcripción de evidencia. Ante todo, hemos tenido siempre presente la deferencia que merece y de la cual es acreedor el distinguido juez sentenciador en la delicada función que le corresponde al formular sus determinaciones de hecho por virtud de la sana y necesaria norma de revisión consagrada en la Regla 43.1 de Procedimiento Civil. El estudio del caso ha dejado en el ánimo de este Tribunal el convencimiento de que se ha cometido un error manifiesto por parte del tribunal de instancia en la apreciación de la prueba, función ésta que es la más delicada que corresponde a un tribunal de hechos. *Román Montalvo* v. *Delgado Herrera,* 89 D.P.R. 428, 436–437 (1963).

◼ Es evidente que el tribunal de instancia hizo suyo un proyecto de determinaciones de hechos y sentencia que le sometió la parte demandante. No sugerimos que deba desalentarse la práctica que suele seguirse en los tribunales de instancia de solicitar y recibir de las partes proyectos de determinaciones una vez sometidos los asuntos al juez para su adjudicación. Al igual que la presentación y uso de memoriales escritos, estas medidas sirven para aliviar el enorme volumen de trabajo que pesa sobre los jueces de instancia y pueden ser de valiosa ayuda al juez en el descargue de su delicada función adjudicativa. Huelga recordar que no es ésta una función delegable. Tales proyectos no pueden sustituir los dictados de la sana y juiciosa crítica del juez en su labor de desentrañar la verdad. En tanto en cuanto surja

una dependencia extrema del juez en estos proyectos, particularmente aquellos ex-parte, nuestro deber nos exige ser más minuciosos en el examen de las determinaciones que son objeto de revisión. El Juez Jerome N. Frank del Segundo Circuito de Apelaciones Federal se expresó así en *United States* v. *Forness*, 125 F.2d 928, 942 (2d Cir. 1942):

"Enfatizamos este asunto por la gran importancia de la determinación de hechos. La determinación correcta, tan exacta como pueda ser, de los hechos en un litigio, es tan sumamente importante como la aplicación de las reglas de derecho apropiadas a los hechos según determinados. Una regla de derecho impecablemente 'correcta' aplicada a los hechos 'incorrectos' produce una decisión tan defectuosa como la resultante de la aplicación de la regla de derecho 'incorrecta' a los hechos 'correctos'. Este último tipo de error, desde luego, puede corregirse en apelación. Pero el anterior no está sujeto a tal corrección a menos que el apelante venza el gran peso de demostrar que las determinaciones de hecho son 'evidentemente erróneas'. El Juez Presidente Hughes comentó una vez: 'Un administrador inescrupuloso puede tener la tentación de decir, "Déjenme determinar los hechos para la gente de mi país, y me importa poco quien establece los principios generales".' Ese comentario debe extenderse para incluir hechos determinados sin el debido cuidado, como también la determinación de hechos, inescrupulosa; pues tal falta del debido cuidado probablemente se revele por sí misma menos que la falta de escrúpulos, que confiamos, rara vez exista. Y el comentario del Juez Presidente Hughes es tan aplicable a la determinación de hechos hecha en forma descuidada por un juez, como a la de un oficial administrativo. El poder judicial propiamente impone a los oficiales administrativos altas normas en el desempeño de su función en la determinación de hechos. El poder judicial debe, por lo menos, responder a las mismas normas."

Sobre esta práctica, véanse: Otis, *Improvements in Statement of Findings of Fact and Conclusions of Law*, 1 F.R.D. págs. 83–87 (1940); Barron and Holtzoff, *Federal Practice and Procedure*, Vol. 2B, sec. 1124, págs. 491–495; Note: *The Role of Counsel in Preparation of Special Findings of Fact:*

*Roberts* v. *Ross*, 344 F.2d 747 (3d Cir. 1965), 51 Cornell L.Q., págs. 567–575; *United States* v. *El Paso Gas Co.*, 376 U.S. 651, 656–657 (1963); *In Re Las Colinas, Inc.*, 426 F.2d 1005 (1st Cir. 1970).

La fuente de la responsabilidad impuesta a la recurrida se encuentra en la siguiente determinación de hecho adoptada por el Tribunal:

"Concluimos que la caída súbita sufrida por la demandante fue ocasionada por estar el piso algo desgastado en el área por el que ella bajaba, pero mayormente por estar altamente resbalosa por haberse mojado pocos momentos antes con el agua con detergente (jabón) que usan en dicho hospital al hacer la limpieza."

Veamos la prueba. La de la parte demandante consistió en el testimonio de la lesionada Francisca Rivera de Malavé y el de su hija María de las Nieves Malavé, quien no presenció el accidente. Declaró la señora Rivera de Malavé que tiene 58 años de edad, usa espejuelos bifocales y que visitaba ese día domingo, alrededor de las cuatro de la tarde, en unión de su hija y otros familiares, una nieta suya que se encontraba recluida en una de las habitaciones del segundo piso del Hospital de la Concepción en San Germán. Después de permanecer allí algún rato decidió seguir a su hija María de las Nieves, quien había bajado a buscar unos regalos en el automóvil que habían dejado en el área de estacionamiento. En relación con la caída declaró a preguntas de su abogado:

"R. Salí atrás de mi hija . . . que ella fue a buscar unos regalos, pero ellos se habían ido alante, yo me quedé abajo y quise bajar más después, bajé la primera base, cuando pisé a la plazoleta de la escalera que tiene, ahí resbalé y me fui al lado de la escalera, resbalé cerca, al caer traté de aguantarme y me fui y caí al otro lado, a la otra plazoleta donde van a entrar." (T.E. pág. 8.)

"R. El descanso, aquí va la otra escalera, *ésta la bajé bien*, cuando caí aquí que puse el pie en esta escalera, me fui, *traté*

*de aguantarme, pero no pude* y caí abajo." (T.E. pág. 9.)

"P. ¿Y doña Francisca, qué fue lo que motivó su caída? ¿Por qué se cayó?

R. Bueno, pues *sería desgracia,* porque yo iba bien, llevo una vida normal, tranquila, *yo sé que resbalé, el piso estaba mojado, eso fue.*

P. Nada más." (T.E. págs. 18–19.) (Bastardillas nuestras.)

Merece destacar el hecho que al ser contrainterrogada doña Francisca fue confrontada con una declaración prestada por ella en una deposición anterior al juicio. El incidente surge de las págs. 24 a la 25 de la transcripción.

"Lcdo. Polo:

Yo le pregunté aquí cuando dijo que estaba brilloso, le pregunté, quiere decir que estaba encerado, estaba pulido o había agua o cáscaras de algo, y usted contestó, 'yo no me pude fijar, yo sé que estaba brilloso', ¿cómo usted sabe que estaba brilloso, sino se pudo fijar?

R. Bueno, yo lo vi brilloso y en ese estado cuando bajaba y entonces cuando me caí seguí.

P. ¿Cuando bajaba vio que estaba brillosa y mojada?

R. *Yo se que estaba como que habían brillado.*" (Bastardillas nuestras.)

Nos parece obvio que la declaración de doña Francisca no puede servir de base, por sí sola, a la determinación del tribunal de que el piso estaba *algo desgastado, altamente resbaloso,* ni que "había sido mojado pocos momentos antes con el agua con *detergente* (jabón)."

La próxima testigo de la parte recurrida fue la hija de doña Francisca. Ella no presenció el accidente. Dijo la testigo a preguntas de su abogado:

"P. ¿En qué condiciones estaba esa escalera?

R. Subiendo en grupo, yo sí noté que estaba un poco resbaladiza como si tuviera cera cuando bajé, siempre yo tengo la precaución de usar el pasamanos, ya hacía rato cuando yo bajé continuaba como si estuviera encerada, brillosa y resbaladiza, estaba un poco resbaladiza." (T.E. pág. 29.)

"R. Inmediatamente me llamaron, yo iba con las dos primas mías; . . . . Fui a ver la escalera inmediatamente, después de ver la escalera dejé a mi mamá con mi tío y las niñas y fui a ver las escaleras y estaban húmedas, estaban bastante mojadas.

P. ¿Sabe usted si alguna persona que usted viese del hospital estaba realizando algunas gestiones de limpieza?

R. Sí, señor; se estaban limpiando, parece que cuando llegamos, el hospital se estaba limpiando." (T.E. pág. 30.)

"Testigo:

Se estaba limpiando, cuando bajé estaban limpiando el primer piso del hospital.

Lic. Pérez:

P. ¿Cómo lo limpiaban?

R. Con un mapo." (T.E. pág. 31.)

Más adelante al ser repreguntada por el abogado de la recurrente, declaró:

"P. ¿Cuando llegó que dice que estaban limpiando, qué sitio específico estaban limpiando?

R. Primer piso.

P. ¿Y le estaban dando brillo con una máquina de brillar?

R. Estaban mapeando.

P. ¿Cuántas personas?

R. Una.

P. ¿Hombre o mujer?

R. Era un hombre.

P. ¿En la escalera no vio haciendo eso?

R. No, señor." (T.E. págs. 37–38.)

Los testimonios de la lesionada Francisca Rivera y de su hija María de las Nieves Malavé constituyen toda la prueba oral de los demandantes. Como parte de su prueba fueron admitidas dos fotografías de la escalera tomadas por María de las Nieves al día siguiente de ocurrido el accidente (T.E.

pág. 29). La parte recurrente ofreció y fueron también admitidas en evidencia dos fotografías de la escalera. Las fotografías ofrecidas por ambas partes muestran que la escalera en toda su extensión estaba cubierta con un material formando ranuras o estrías transversales, cuyo propósito evidente es evitar una superficie lisa que propicie las caídas. Además, estaba dotada de dos pasamanos, uno a cada lado. El tribunal no formuló ninguna conclusión sobre ello. Pero sí formuló una conclusión al efecto de que la escalera se encontraba *altamente resbalosa* por haberse mojado pocos momentos antes "con el agua con detergente. (jabón) que usan en dicho hospital al hacer la limpieza."

Nos parece claro que los testimonios de la lesionada y su hija no sostienen dicha conclusión. La lesionada declaró, como hemos visto, que hasta "el descanso *lo había bajado bien*" y que "*cuando caí aquí que puse el pie en esta escalera, me fui, traté de aguantarme, pero no pude . . . .*" Y al preguntársele por su abogado cuál había sido el motivo de la caída, contestó ". . . *yo sé que resbalé, el piso estaba mojado, eso fue.*" (T.E. págs. 18–19). (Bastardillas nuestras.) Su hija testificó que la escalera "estaba brillosa . . . un poco resbaladiza . . . , húmedas, bastante mojadas" (T.E. págs. 29–30).

La sentencia recurrida descansa en la supuesta presencia de un detergente líquido mezclado con agua utilizado por el hospital en la limpieza efectuada momentos antes, el cual creó una condición *altamente* resbaladiza en la escalera. La referencia al detergente surge únicamente por voz del testigo Eliseo Borrero, Administrador del Hospital. A preguntas de la recurrente, declaró este testigo que la limpieza de los pisos y las escaleras se hace diariamente entre seis y siete de la mañana, hora en que no hay visitas, utilizando un detergente industrial disuelto en agua de uso general en los hospitales (T.E. pág. 78), y luego se seca con un mapo

"bien seco" (T.E. pág. 83), y que durante las horas de visita no se hace este tipo de limpieza, excepto recoger los papeles y colillas de cigarillos que caigan al piso (T.E. pág. 10).

La conclusión sobre la presencia del detergente como factor de responsabilidad en este caso no es la más lógica y racional, ni la más justa. El accidente ocurrió un domingo a las 4:30–5:00 de la tarde, en horas de visitas. Parece improbable que el hospital adoptase estas medidas de limpieza en las horas en que, precisamente por estar abierto al público, resultaría más oneroso para los visitantes, el público en general y el hospital en contra de su natural interés de lograr un mejor resultado sin exponerse a contratiempos con los visitantes que tales labores puedan ocasionar. De entre toda una declaración, el tribunal logró entresacar el uso del detergente y situarlo, fuera del contexto de la declaración del testigo, como factor determinante de responsabilidad.

■ El tribunal cometió un error manifiesto de apreciación. La hija de la lesionada declaró a preguntas del juez que dos a dos horas y media después del accidente había hablado con una de las religiosas, cuyo nombre no recordaba, que hacían labor de caridad en el hospital y le había informado que el borde de la escalera "estaba desgastado" (T.E. pág. 43). Una de estas religiosas, Sor María Díaz, declaró durante el juicio. Dijo ser la Directora de las enfermeras; tuvo conocimiento del accidente momentos después de ocurrido; examinó la escalera, la encontró seca y limpia (T.E. pág. 52). Esta testigo declaró que la hija de la señora lesionada le había alegado que "la escalera estaba desgastada" (T.E. pág. 53). Nada declaró la hija de la lesionada de haberse quejado a la religiosa sobre la condición de humedad de la escalera. Las contestaciones de los recurridos a los interrogatorios escritos de la recurrente en torno a las circuns-

tancias del accidente, mantenimiento de las escaleras, etc., tampoco informan el estado ·de humedad de la escalera como factor o ·base de responsabilidad. (¹)

■ Una ojeada a la jurisprudencia reciente sobre caídas en escaleras demuestra que actuamos en estos casos con particular minuciosidad en el descargue de nuestra misión revisadora. Tratándose de caídas en escaleras es · natural que así sea. Como se dijo en *Santaella Negrón* v. *Licari*, 83 D.P.R. 887, 900 (1961).

"La existencia de una escalera por donde una persona ha de transitar es aparente y obvia y también es de esperarse que làs personas ejerzan prudencia y cuidado al subir o bajar escaleras."

Así, por ejemplo, en *Weber* v. *Mejías*, 85 D.P.R. 76, 80 (1962), después de un minucioso examen del· récord, revocamos la sentencia que declaró sin lugar la demanda sosteniendo que aunque nos encontrábamos con un· caso "difícil" era pertinente enfatizar que la superficie de los peldaños era pulida, que unida a la construcción en descubierto, propendía a convertirlos en resbaladizos cuando se mojan por efecto de. las lluvias.

En *Torres* v. *Metropolitan School*, 91 D.P.R. 1, 7 (1964), al revocar una sentencia que impuso responsabilidad a la demandada—las losetas de las escaleras eran completamente lisas y las escaleras tenían solo un pasamanos—, sostuvimos que:

"Son defectuosas, a los efectos de imponer responsabilidad en estos casos, aquellas escaleras con escalones gastados, rotos, con hoyos, agrietados, salidos, con clavos o tornillos sobresalientes o que son de tamaño o forma irregular, muy gastados, lisos como cristal y muy resbalosos."

(¹) Durante la vista oral ante nos, el ·abogado de la parte recurrida reconoció que el factor de "desgaste" de la escalera no era suficiente como base de responsabilidad. En efecto así es. La prueba sobre este extremo fue sumamente vaga e imprecisa para servir de apoyo a una conclusión sobre responsabilidad.

En *Ferro* v. *A.M.A.*, 91 D.P.R. 770 (1965), una señora se cayó al descender de un autobús. El tribunal sentenciador había determinado que el accidente ocurrió porque los escalones de salida de la guagua eran de metal, tenían más de cuatro años de uso, estaban bastante desgastados y no tenían la protección de alfombra de gomas, a consecuencia de cuya circunstancia la demandante resbaló al apoyar su pie en el último escalón, cayendo de bruces a la acera. Al revocar sostuvimos, a la pág. 771:

"La prueba anteriormente reseñada no es suficiente para establecer que los escalones estuvieran lisos, máxime si se considera que la parte demandada presentó en evidencia unas fotografías de los escalones y éstas muestran que tenían estrías y no estaban lisos o gastados. La ausencia de gomas en los escalones no constituye negligencia, pueden ser seguros sin tener que estar protegidos por alfombras de goma cuando como en el presente caso tenían estrías, cuyo propósito es evitar una superficie completamente lisa que propicie las caídas."

En *Feliciano* v. *Escuela de Enfermeras*, 94 D.P.R. 535 (1967), se estableció por la prueba de la propia parte demandada que el piso de la escalera era sumamente liso y resbaloso aunque estuviera seco. Fue basándonos primordialmente en esa prueba que sostuvimos la sentencia condenatoria. Y a pesar de la existencia de esa prueba de los demandados, cuatro jueces votaron por revocar la sentencia, sosteniendo en su disenso, a la pág. 546:

"Indudablemente, la recurrida trató de probar que resbaló en agua por dos razones, es decir (1) para tratar de asemejar su caso al de *Weber*, supra; y (2) porque la prueba de estar el piso resbaladizo, al extremo de constituirse en peligroso era sumamente débil e imprecisa ya que los dos testigos antes mencionados sólo dijeron en contrainterrogatorio que era resbaladizo 'hasta cierto punto' o 'a veces'. Por otra parte, la prueba fue clara y firme de que el piso no estaba mojado. No hubo circunstancia alguna que justifique asemejar este caso al de *Weber*, supra."

*La sentencia recurrida será revocada.*

El Juez Presidente, Señor Negrón Fernández, y el Juez Asociado Señor Hernández Matos no intervinieron.