LONG TERM CARE CENTERS OF PR, INC. H/N/C/ LONG TERM CENTER CTR
Y LONG TERM CARE CENTER DR. ADALBERTO ARANA
Recurrente

v.

METROHEALTH EXTENDED CARE, INC. D/H/C METROHEALTH EXTENDED CARE
Recurrido

Núm. KLRA-05-00818

San Juan, Puerto Rico, a 12 de enero de 2006

Panel integrado por su Presidente, el Juez Arbona Lago,
el Juez Miranda De Hostos y la Juez Pabón Charneco

Pabón Charneco, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos Long Term Care Center, en adelante, el recurrente, solicitando la revocación de una Resolución emitida por la Secretaría Auxiliar para la Reglamentación y Acreditación de Facilidades de Salud del Departamento de Salud, en adelante SARAFS. Mediante dicho dictamen, la agencia denegó el Certificado de Necesidad y Conveniencia solicitado por el recurrente, para la operación de un Centro de Cuidado Extendido en el Municipio de Bayamón.

Por las razones que se esbozan a continuación, se confirma la Resolución recurrida.

### I

Conforme surge del recurso ante nuestra consideración, el 1 de julio de 2004, el recurrente, por conducto del Dr. Adalberto Arana Alonso, presentó, ante SARAFS, una solicitud para la obtención de un Certificado de Necesidad y Conveniencia ██ para establecer un Centro de Rehabilitación y Recuperación para pacientes agudos de larga duración. ██

Dicha solicitud fue acompañada de los documentos requeridos, incluyendo un Estudio de Viabilidad ██ dirigido a demostrar la necesidad de este tipo de servicio en el área propuesta. Este estudio de viabilidad fue realizado por Business Advisers, Inc. El referido Centro de Cuidado Extendido estaría supuesto a ubicarse dentro de las facilidades de Hospital Mepsi Center en el Municipio de Bayamón.

El 22 de julio de 2004, SARAFS emitió una *"Notificación de Informe a Partes Afectadas"*, ██ en la cual determinó que no existían facilidades similares en el área propuesta en dicha solicitud, entiéndase en el área de Bayamón, incluidos los Municipios de Toa Alta y Vega Baja.

El 29 de julio de 2004, Metrohealth Extended Care, en adelante Metrohealth, entidad que ofrece servicios de cuidado prolongado en el área de Luquillo, interpuso una *"Notificación sobre Interés de Participación"* ██ en el proceso de adjudicación del Certificado de Necesidad y Conveniencia solicitado por el recurrente. Metrohealth adujo que se le debía permitir participar en las vistas públicas en calidad de opositor a la solicitud del recurrente. En la alternativa, solicitó participar *"en calidad de Interventor, ya que nuestra participación (Metrohealth) contribuirá a tener un expediente administrativo más completo y aportará información que se ha adquirido a través de los ocho años que ha estado operando Metrohealth Extended Care."* ██

El 6 de agosto de 2004, SARAFS notificó escrito intitulado *"Informe de Partes Opositoras"*, ██ mediante la cual le notificó al recurrente que Metrohealth había instado su oposición como entidad dentro del área de servicio de su propuesta. En consecuencia, le informó que debía notificarle a Metrohealth copia del Estudio de Viabilidad, y de todo escrito que hubiera presentado o se presentara, en adelante, ante la División de Vistas Administrativas. El 7 de septiembre de 2004, el recurrente presentó una *"Moción Urgente en Oposición a Notificación sobre Interés de Participación Radicada por Metrohealth Extended Care"*. ██ Como respuesta a dicha moción instada por el recurrente, el 24 de septiembre de 2004, Metrohealth presentó oportuna oposición. [9]

Considerando las anteriores mociones presentadas tanto por el recurrente como por Metrohealth, el 4 de octubre de 2004, SARAFS notificó la aceptación de Metrohealth como Interventor. ██ Posteriormente, el 26 de octubre de 2004, SARAFS emitió Resolución ██ denegando la solicitud de Metrohealth como parte

opositora. Tal Resolución se fundamentó en lo siguiente:

*"El edicto notificando la propuesta se publicó en el Periódico El Vocero el 9 de julio de 2004. No surge que dentro del área de servicio haya entidades similares a la propuesta. Por tanto, el período perentorio de quince (15) días que tenía Metrohealth para comparecer a anunciar su intención de participar en la vista en su fondo, tanto bajo el procedimiento permitido para CNC por el Reglamento 112 así como bajo el procedimiento de intervención bajo el Reglamento 85 de Salud, expiró el día 22 de julio de 2004. Por ello, la solicitud de Metrohealth es tardía y por la presente se deniega su solicitud de participación. Si podrá comparecer a la vista en su fondo y de quererlo podrá contrainterrogar. Pero no podrá presentar prueba por las razones mencionadas."*

*Id.*

En esta etapa, es pertinente apuntar que el área de servicio cubierta por Metrohealth comprende los municipios de Luquillo, Canóvanas, Ceiba, Culebra, Fajardo, Loíza, Naguabo, Río Grande y Vieques.

Ante la notificación antes referida emitida por SARAFS, el recurrente presentó, entre otros, una *"Solicitud de Corrección Num Pro Tun (sic) y Reconsideración de Intervención"*. ■ SARAFS, mediante Resolución de 29 de noviembre de 2004, ■ determinó que resolvería las mociones en la Vista Sobre el Estado de los Procedimientos pautada para el 13 de diciembre de 2004.

El 20 de diciembre de 2004, la Oficial Examinadora emitió una Minuta/Orden, ■ relacionada a la Vista Sobre el Estado de los Procedimientos realizada en la fecha señalada. Mediante la misma, se permitió que Metrohealth participara como Interventor limitado, a saber, con derecho a ser oído, contrainterrogar y presentar prueba que sustentara su ponencia como Interventor, mas no se le permitió descubrir prueba.

Así las cosas, los días 24 y 25 de mayo de 2005, se celebró la vista administrativa sobre la otorgación del referido Certificado de Necesidad y Conveniencia al recurrente. El 12 de julio de 2005, se emitió el Informe del Oficial Examinador. ■ En dicha vista, testificó, por el recurrente, el Dr. Adalberto Arana Alonso. ■

Aquilatada la prueba testifical y documental, la Oficial Examinadora emitió Resolución el 6 de octubre de 2005. Surge de la Resolución recurrida las siguientes determinaciones de hechos, las cuales transcribimos *in extenso:*

*"1. La facilidad y acción solicitada en la Solicitud para Certificado de Necesidad y Conveniencia fechada el 1 de julio de 2004, establecer un "centro ejemplar de rehabilitación y recuperación física y mental para pacientes agudos de larga duración".*

*2. La ubicación descrita en el Formulario de Solicitud antes reseñado, sita la facilidad propuesta dentro de las facilidades del Hospital Psiquiátrico Mepsi Center, en la Carretera Número 2, Km. 8.2, Bayamón, PR 00960. El edicto publicado por el Departamento de Salud, para dicha propuesta refleja la dirección anteriormente mencionada.*

*3. Junto a la solicitud de CNC, el proponente presentó un Estudio de Viabilidad con fecha del 22 de julio de 2004, preparado por Business Advisers Inc.*

*4. De acuerdo a lo expuesto en el Estudio de Viabilidad, la facilidad propuesta se ubicaría en la dirección antes indicada, en unas facilidades ya existentes en los edificios 15 y 16 del Hospital Mepsi. El Estudio se basa en el establecimiento escalonado de camas de cuidado extendido, divididas entre camas privadas y semi-privadas, hasta llegar a un total de 132 camas. El Estudio de Viabilidad establece, como inversión inicial, la*

*cantidad de $100,000.00, pero no indica las fuentes de financiamiento ni del capital que serán utilizadas. En la vista celebrada no se produjeron los estados financieros de la corporación, ni tampoco los correspondientes al Dr. Arana. No se probó la capacidad económica de la proponente para iniciar sus operaciones.*

*5. En el Estudio de Viabilidad se indica que el proyecto estaría listo en 6 meses.*

*6. En la Vista Administrativa del 24 de mayo de 2005, la parte proponente sometió su prueba. La misma consistió únicamente en el testimonio del Dr. Adalberto Arana Alonso. La parte interventora presentó el testimonio del Licenciado Ahmed Álvarez.*

*7. El Dr. Adalberto Arana Alonso testificó ser el Presidente de Long Term Care Center, Inc., entidad que firmó un contrato de arrendamiento con Mepsi Center Hospital. El Dr. Arana testificó, que el Contrato iba dirigido al arrendamiento de la planta física en donde se ubicaría la facilidad propuesta, como también la contratación de los servicios auxiliares de limpieza, provisión de alimentos y mantenimiento.*

*8. Copia del contrato presentado en la vista del 25 de mayo de 2005, contiene una fecha de expiración del 30 de junio de 2005.*

*9. El Dr. Arana testificó que el contrato no había sido renovado. El Dr. Arana también testificó que además de los servicios auxiliares que serían provistos por Mepsi, también utilizaría los servicios de enfermería del Hospital. Aunque el Dr. Arana testificó que dichos servicios se desprendían en el contrato, el mismo se limita a ser un contrato de arrendamiento. En el contrainterrogatorio, el Dr. Arana testificó que no sabía cuántas enfermeras tiene Mepsi y no sabe la cantidad específica de enfermeras que utilizará en su centro.*

*10. El Dr. Arana testificó que el Centro Long Term Care no posee criterios clínicos establecidos. También testificó que el centro no va a poseer una facultad médica propia y que utilizará los servicios de médico generalista de Mepsi. Se especificó que no contará con los servicios de sub-especialistas y que sólo contratarán especialistas médicos dependiendo de las necesidades de los pacientes.*

***11. El Dr. Arana en su testimonio no especificó si ya inició el proceso de reclutamiento para el personal administrativo y para el personal especializado que provee las terapias que serían provistas en el Centro. Sin embargo, testificó que la facilidad propuesta contaría con un director médico, un director administrativo, un trabajador social, 5 enfermeras graduadas, 8 asistentes de enfermería con experiencia, 4 empleados de mantenimiento y apoyo, y 2 oficinistas.***

***12. El proponente no presentó prueba si el Centro propuesto tiene acuerdos de transferencia de pacientes con algún hospital de área, ni tampoco si tiene algún acuerdo de intercambio con alguna institución educativa.***

*13. Del testimonio ofrecido por el Dr. Arana, no se desprendió que supiera distinguir entre los servicios ofrecidos por un centro de cuidado extendido, un centro de cuidado agudo y un centro de cuidado de enfermería especializado. Sin embargo, luego de escuchar el testimonio del Dr. Arana, la oficial examinadora entiende que la solicitud es para establecer una facilidad de cuidado extendido.*

*14. El proponente no presentó el testimonio de su perito por lo que el Estudio de Viabilidad quedó marcado como identificación. Sin embargo, dicho documento fue utilizado por el Dr. Arana en su testimonio y dicho testimonio no fue objetado por la parte interventora y la oficial examinadora permitió que se hiciera referencia al mismo.*

*15. Por la parte interventora testificó el Licenciado Ahmed Álvarez, Director Ejecutivo de la facilidad*

934

*MetroHealth Extended Care, Inc. Álvarez testificó que opera una facilidad de cuidado extendido en el Municipio de Luquillo. Dicha facilidad opera bajo el CNC expedido el pasado 5 de agosto de 1998, con el número 98-210. La facilidad se encuentra en el Barrio Mameyes I, Carr. 3, Km. 32.0 Interior Luquillo.*

*16. Las facilidades que opera la interventora, se dividen en varios edificios tipo villa, en donde los pacientes reciben las terapias y cuidados recomendados por el médico referente y la facultad médica de la facilidad. Además, se aclaró que la facilidad cuenta con sus propios servicios de mantenimiento, limpieza, alimento y nutricionista.*

*17. Álvarez testificó que el personal especializado contratado por la facilidad que administra se encuentra un médico internista, un fisiatra, tres terapistas ocupacionales, tres terapias auxiliares, una dietista, 7 enfermeras graduadas y 12 enfermeras prácticas.*

*18. Álvarez testifica que la facilidad tiene 54 camas aprobadas y que su censo promedio es de 70%, que los pacientes atendidos en la misma provienen de todas las partes de la isla, en especial del área metropolitana de San Juan.*

*19. Álvarez testificó que la apertura de la facilidad propuesta afectaría la estabilidad de la facilidad que administra, ya que la mayoría de sus pacientes provienen del área metropolitana. De aprobarse la facilidad propuesta el censo de su facilidad disminuiría drásticamente.*

*20. Dentro del área de servicio de la facilidad propuesta no existen facilidades similares.*

*21. El Dr. Arana testificó que aceptaría el plan de reforma de salud."*

***22. El Dr. Arana intentó testificar sobre la viabilidad económica del proyecto y la data contenida en el Estudio de Viabilidad de la parte proponente, sin embargo, su testimonio en lo referente al Estudio de Viabilidad no nos mereció credibilidad. Fue evidente que el Dr. desconocía la manera en que varios cómputos se habían hecho. Por ejemplo, éste admitió en su testimonio que desconocía de dónde salía o cómo se computó el estimado de que el 19% de la población convaleciente que es dada de alta de un hospital necesita servicios de cuidado extendido. Por lo tanto, el análisis de oferta de demanda potencial no nos merece ninguna credibilidad. Tampoco nos merece credibilidad su información vertida sobre la viabilidad económica, toda vez que el Dr. Arana no fue cualificado como perito economista. El no haber sentado al perito de la parte proponente a testificar no puso a la oficial examinadora en condiciones de preguntar sobre el estudio de viabilidad.***

*23. El estudio de viabilidad tan sólo hace referencia a uno de los cuatro criterios específicos que son necesarios probar para poder evaluar la propuesta de epígrafe. En esencia, se obvió pasar prueba testifical o documental sobre los criterios específicos del Reglamento 112.*

*24. No se presentaron estados financieros de la entidad proponente y no se desfiló prueba testifical pericial por la parte proponente. Tampoco se anejaron los informe financieros más recientes que actualizaran la situación financiera de los proponentes y confirmara que la misma no ha sido objeto de cambios adversos. Sorprendentemente, el proponente no presentó a su perito a testificar. El proponente falló en probar lo más básico: la viabilidad económica de la propuesta, y la oferta y demanda al no presentar como prueba al autor del estudio de viabilidad. Por lo cual ignoramos la necesidad y viabilidad económica de la propuesta, así como la oferta y la demanda."* (Énfasis suplido)

Véase, págs. 4-8 del Apéndice.

En consecuencia, el Departamento de Salud denegó la expedición del Certificado de Necesidad y Conveniencia solicitado por el recurrente para operar el Centro de Cuidado Extendido. Expresó que el recurrente *"no cumplió con su obligación de demostrar de forma clara, convincente y razonable que existe una necesidad y conveniencia real en el área de servicio en la que se propone establecer la facilidad y que sus servicios propuestos cumplen a cabalidad con las guías generales y los criterios particulares aplicables para evaluar una solicitud de CNC para una facilidad de cuidado extendido."* ■

En oportuna respuesta a dicha Resolución, el 25 de octubre de 2005, el recurrente presentó una *"Solicitud de Exposición más Definida de Hechos y Derechos y Solicitud de Reconsideración a Resolución Dictada"*, no siendo acogido el escrito por la agencia administrativa. ■

Inconforme, el recurrente acude ante nos. Contando con el beneficio del alegato del Departamento de Salud y el de Metrohealth, procedemos a resolver. ■

## II

En su escrito, el recurrente plantea que incidió SARAFS al denegar la solicitud del CNC al no ejercitar a favor de la otorgación de éste, la facultad que la Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, le otorga, por ser ello contrario e inconsistente al propósito de la ley y además afectar sustancialmente derechos fundamentales; al descansar para su decisión en el Informe de la Oficial Examinadora, que no se ajusta a la evidencia admitida y que además excluyó erróneamente evidencia que obra en el expediente, la que reduce y menoscaba completamente las determinaciones de hechos de dicho informe y demuestra de forma incontrovertible que no hay evidencia alguna en el expediente que pueda sostener las determinaciones y conclusiones de hechos y derecho contenidas en dicho informe en las cuales descansó la Honorable Secretaria para la decisión al denegar el Certificado de Necesidad y Conveniencia; la falta de disponibilidad de las cintas magnetofónicas que gravaron las vistas pautadas para el 24 y 25 de mayo de 2005, para que el personal técnico contratado para la transcripción pudiera hacer las mismas, esto queda exacerbado por lo ininteligible de éstas y por las omisiones de una parte sustancial de lo declarado a favor del recurrente, todo lo cual tiene el efecto de privar al recurrente de su derecho constitucional a una revisión judicial del expediente en su totalidad, lo que no satisface el debido procedimiento de ley, tanto en su dimensión sustantiva como procesal; al violar el principio de que todos los que participen en la decisión conozcan la evidencia.

## III

La Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, 24 L.P.R.A. sec. 334 *et seq.,* y el Reglamento del Secretario de Salud Núm. 112 del 7 de abril de 2004 rigen el procedimiento de solicitud y expedición de los Certificados de Necesidad y Conveniencia para la instalación de facilidades de salud. Uno de los propósitos del estatuto es limitar la construcción excesiva de facilidades de salud sin que se tome en consideración la necesidad de dicho servicio en el área de desarrollo propuesta. *Asoc. Fcias. Com. v. Dpto. de Salud,* 156 D.P.R. ___ (2002), **2002 J.T.S. 18**.

Por su parte, la Ley Núm. 2, *supra*, dispone:

*"(n)inguna persona podrá adquirir o construir una facilidad de salud u ofrecer o desarrollar un nuevo servicio de salud, hacer inversiones de capital por, o a favor de, una facilidad de salud o adquirir equipo médico altamente especializado sin antes haber obtenido un Certificado de Necesidad y Conveniencia otorgado por el Secretario."*

24 L.P.R.A. sec. 334(a).

La ley y la reglamentación han logrado, hasta cierto punto, regular la planificación de las instalaciones de servicios de salud para que su distribución pueda atender su satisfacer las necesidades de salud por área y velar

los costos de estos servicios.

La Ley Núm. 2, *supra*, define el Certificado de Necesidad y Conveniencia como un documento emitido por el Secretario de Salud autorizando a una persona o entidad a llevar a cabo cualquiera de las actividades cubiertas por el estatuto. El Certificado de Necesidad y Conveniencia certifica que ese servicio es necesario en esa área y que no afecta indebidamente a los servicios existentes en el área propuesta. 24 L.P.R.A sec. 334(e). El Secretario de Salud posee la facultad y la discreción de expedir o denegar los Certificados de Necesidad y Conveniencia solicitados conforme al propósito del estatuto. *Lab. C. Inst. Med Ava. v. Lab. Borinquen,* 149 D. P.R. 121 (1999); *Ruiz Hernández v. Mahíques,* 120 D.P.R. 80 (1987).

La otorgación o denegación de un Certificado de Necesidad y Conveniencia es un proceso evaluativo administrativo sobre el cual el Secretario ejerce su discreción. *Lab. C. Inst. Med Ava. v. Lab. Borinquen, supra; Hospital San Pablo v. Hosp. Hermanos Meléndez,* 123 D.P.R. 720 (1989). Este proceso evaluativo comprende diversos factores dispuestos en el citado Reglamento Núm. 112. Dichos criterios generales son los siguientes:

*"1. La relación entre la transacción para la cual se solicita el certificado y el plan de servicios a largo plazo, si alguno, del solicitante;*

*2. La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma;*

*3. La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante;*

*4. La relación entre el sistema de salud operante en el área y la transacción propuesta;*

*5. En el caso específico de solicitantes de Certificados de Necesidad y Conveniencia para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:*

*La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios;*

*El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del área en donde los servicios habrán de prestarse;*

*El porciento de la población del área a ser servida que tendrá acceso a los servicios propuestos;*

*El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción.*

*6. La existencia de una demanda por los servicios a ofrecerse, que sobrepase la oferta en aquella cantidad que sea suficiente para permitir la viabilidad de la facilidad de salud propuesta."*

Colegimos que la solicitud de un Certificado de Necesidad y Conveniencia descansa en un análisis multifacético de servicio de salud propuesto el cual incluye, pero no se limita, a datos estadísticos. Ciertamente la discreción a ejercerse por el Secretario de Salud está sumamente arraigada a consideraciones estadísticas sobre el potencial, la necesidad y la viabilidad del servicio de salud propuesto en un área determinada.

Asimismo, debemos tener presente que las conclusiones e interpretaciones de los organismos y agencias administrativas especializadas merecen gran consideración y respeto de los tribunales. *M&V Orthodontics v.*

*Negdo. Seg. Empleo*, 115 D.P.R. 183, 188 (1984). La revisión judicial debe limitarse a determinar si actuaron arbitrariamente, ilegal o en forma tan irrazonable que la actuación constituya un abuso de discreción. *Franco v. Dpto. de Educación*, 148 D.P.R. 703 (1998).

La intervención judicial en estos casos, de este modo, ha de centrarse en tres aspectos principales: (1) si el remedio concedido fue apropiado, (2) si las determinaciones de hechos están razonablemente sostenidas por la prueba, y (3) si las conclusiones de derecho del organismo administrativo son correctas. Sec. 4.5 de la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como *"Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico"*, 3 L.P.R.A. sec. 2175; *Otero Mercado v. Toyota de Puerto Rico Corp.*, 163 D.P.R. ___ (2005); **2005 J.T.S. 13**; *P.R.T.C. v. R. Reg. Tel. de P. R.*, 151 D.P.R. 269 (2000); *Misión Ind. P.R. v. J.P. y A.A.A.*, 142 D.P.R. 656 (1997).

La norma reiterada es que los tribunales apelativos no intervienen con las determinaciones de hechos formuladas por una agencia administrativa si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo. *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70 (2000); *Domínguez v. Caguas Expressway Motors*, 148 D.P.R. 387 (1999); *T. JAC, Inc. v. Caguas Centrum Limited*, 148 D.P.R. 70 (1999).

La evidencia sustancial para sostener la actuación administrativa es aquélla que una mente razonable puede aceptar como adecuada para sostener una conclusión. La intervención del Tribunal está limitada a evaluar si la decisión de la agencia es razonable y no si hizo una determinación correcta de los hechos ante su consideración. Si existe más de una interpretación razonable de los hechos, los tribunales sostendrán la decisión de la agencia y no sustituirán su criterio por el de ésta. Al revisar las determinaciones de hechos, la evidencia debe ser considerada en su totalidad. *Asoc. Vec. H. San Jorge v. U. Med. Corp., supra.*

En consecuencia, las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto, por lo que el ejercicio de nuestra función revisora está limitado a determinar si la agencia actuó arbitraria, ilegal o tan irrazonablemente que su actuación constituyó un abuso de discreción. *Misión Ind. P.R. v. J.P. y A.A.A., supra; Reyes Salcedo v. Policía de P.R.*, 143 D.P.R. 85 (1997). Esto se cumple cuando se encuentra una base racional en el récord administrativo para sostener las conclusiones de la agencia, sin sustituir el criterio del tribunal por el de la agencia administrativa. *Misión Ind. P.R. v. J.P. y A. A.A., supra; Metropolitana, S.E. v. A.R.P.E.*, 138 D.P.R. 200 (1995).

## IV

Dentro del marco jurídico antes enunciado, procedamos a resolver la controversia ante nuestra consideración. En la discusión de sus errores, el recurrente recalca una y otra vez que la Resolución recurrida es un calco de un Memorando de Derecho sometido por Metrohealth. A su vez, intima que la Oficial Examinadora demostró parcialidad en su decisión.

Nos plantea, asimismo, que existe una necesidad y conveniencia real en el área de servicio en la que se propone establecer la facilidad propuesta y que los servicios propuestos cumplen a cabalidad con las guías generales y los criterios particulares aplicables para evaluar una solicitud de Certificado de Necesidad y Conveniencia. Evaluado el expediente, concurrimos en parte con esta premisa, sin embargo, lo anterior no significa que se debe hacer abstracción de otros criterios fundamentales a ser tomados en consideración. La necesidad de un servicio, por sí sólo, no debe ser factor único en este tipo de decisiones. Conforme el ordenamiento jurídico debe cumplirse con todos los criterios establecidos.

Comencemos apuntando que los datos estadísticos son el eje central del proceso evaluativo sobre la expedición o denegatoria de un Certificado de Necesidad y Conveniencia particularmente para demostrar la necesidad del servicio que se ostenta ofrecer en una demarcación geográfica específica. El censo del área, la

demografía de su población, el crecimiento proyectado por sector de edades y el ingreso *per capita* de sus habitantes, es información imprescindible para evaluar si procede o no la expedición de un Certificado de Necesidad y Conveniencia.

Los estudios de viabilidad recopilan, tabulan e interpretan estadísticamente la realidad social de un sector en función de las condiciones socio-económicas, socio-educativas y de salud del mismo. Estos estudios de viabilidad merecen credibilidad siempre y cuando sean realizados por peritos expertos en la materia.

Sin embargo, y conforme apuntado, es imprescindible evaluar, además, factores del solicitante del Certificado de Necesidad y Conveniencia que desdoblen su realidad económica para sostener la facilidad de salud propuesta a corto y largo plazo. Uno de los factores predominantes es la existencia de otras facilidades similares en el área propuesta y cómo se afectarían éstas de permitirse una facilidad similar adicional. También se toma en consideración detalles de logística como empleados, mantenimiento y seguridad. La propuesta en el caso de autos, adolece de muchos de estos criterios.

En el presente caso, el recurrente pretende desarrollar un Centro de Cuidado Extendido en el Municipio de Bayamón, el cual comprende los municipios de Toa Alta y Vega Baja. Si bien es cierto, y así lo apuntó SARAFS en dos (2) ocasiones, que no existen facilidades similares a la del recurrente en el área de Bayamón, reiteramos que lo anterior no significa que debamos hacer abstracción de otros criterios esenciales para la expedición del Certificado de Necesidad y Conveniencia.

El Reglamento Núm. 112, *supra,* establece unos criterios generales y otros específicos que hay que ponderar y evaluar caso a caso para determinar si procede la otorgación del Certificado de Necesidad y Conveniencia. Estos criterios fueron evaluados por SARAFS para llegar a la determinación de denegar la expedición del Certificado de Necesidad y Conveniencia. Así surge de la Resolución recurrida. Veamos.

**Criterios Generales:**

1. La relación entre la transacción para la cual se solicita el certificado y el plan de servicios a largo plazo, si alguno, del solicitante:

Surge del testimonio del Dr. Arana que no pudo establecer los pormenores de su plan de desarrollo y servicios. Sobre el particular, se remitió a declarar que de concederse el Certificado de Necesidad y Conveniencia aceptaría el Plan de Salud de la Reforma. ■

2. La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma.

Sobre este criterio no se desfiló prueba que pudiera poner a la Oficial Examinadora en condición de evaluar la misma. ■

3. La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante.

Sobre este particular tampoco se desfiló prueba, pero sí se estableció que no hay facilidades que presten el servicio propuesto dentro del área de servicio correspondiente. ■

4. La relación entre el sistema de salud operante en el área y la transacción propuesta.

El recurrente se limitó a indicar que aceptaría el Plan de Reforma de Salud. ■

5. En el caso específico de solicitantes de Certificados de Necesidad y Conveniencia para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:

i. La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios.

En cuanto a los recursos humanos, el recurrente se limitó a indicar el personal especializado que utilizaría en el servicio propuesto y que contaría con el personal de Mepsi Center. Sin embargo, y conforme apuntó la Oficial Examinadora, dichos empleados son de Mepsi Center, sin probarse la disponibilidad que estos empleados, los cuales están atados contractualmente con otra institución, puedan emplearse para la prestación de sus servicios en la facilidad propuesta. El tipo de servicio que desea prestar el recurrente requiere la contratación de personal especializado, que no han sido vislumbrados en los gastos operacionales de la facilidad propuesta. Referente a la capacidad financiera tampoco se desfiló prueba que pusiera a la Oficial Examinadora en condición de evaluar este requisito. No se sometieron estados financieros de ninguna índole que pudiesen arrojar luz sobre este hecho. ■■■

ii. El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del área en donde los servicios habrán de prestarse.

El recurrente no presentó prueba de si su facilidad contaría con algún acuerdo de intercambio con alguna institución educativa de cuidado clínico.

iii. El porciento de la población del área a ser servida que tendrá acceso a los servicios propuestos.

No se desfiló prueba sobre este particular. ■■■

iv. El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción.

El Estudio de Viabilidad sometido por el proponente señala que seis meses. ■■■

6. La existencia de una demanda por los servicios a ofrecerse, que sobrepase la oferta en aquella cantidad que sea suficiente para permitir la viabilidad de la facilidad de salud propuesta.

No se cumplió con este requisito. ■■■

## CRITERIOS ESPECÍFICOS

*"B. Facilidad de cuidado extendido- (cuidado diestro de enfermería) Institución según queda definida en el Artículo III, Inciso 15. Se establece la Sub-región como el área de servicio básica.*

*Se establecerá la tasa de utilización de estos servicios en consideración a la población de cada uno de los siguientes grupos de edad: 0-64; 65-74; 75-84 y 85 años o más."*

1- Se considerará la tasa de días pacientes para la población (de cada grupo de edad) por cada 1,000 y luego se dividirá entre 365 para obtener un censo promedio diario. Se aplicará a las proyecciones de población por grupo de edad para el año en que se contempla comenzar la operación de la facilidad.

Sobre este criterio no se desfiló prueba. ■■■

2- Se sumarán los distintos valores de los grupos de edad y se dividirá este resultado entre 365 y se obtendrá el censo diario de pacientes para área de servicio.

Sobre este criterio no se desfiló prueba. ■■

3- No se podrá establecer una facilidad de cuidado extendido adicional, a menos que las establecidas en el área de servicio propuesta alcancen un 75% de ocupación en el último periodo de 12 meses consecutivos.

No existe ninguna facilidad de cuidado extendido en el área de servicio donde se pretende ubicar la facilidad propuesta, por lo que se cumple con este criterio. ■■

*"Para aprobar cualquier aumento en la capacidad de una facilidad existente, se tendrá que demostrar que el mismo no conlleva un exceso de oferta para el área de servicio."*

No existe ninguna facilidad de cuidado extendido en el área de servicio donde se pretende ubicar la facilidad propuesta, por lo que se cumple con este criterio. ■■

Véase, págs. 10-12 del Apéndice.

Asimismo, surge de la Transcripción de la Prueba que el Dr. Arana testificó que el Contrato con Mepsi Center iba dirigido al arrendamiento de la planta física donde se ubicaría la facilidad propuesta, así como la contratación de los servicios auxiliares de limpieza, provisión de alimentos y mantenimiento. Sin embargo, la fecha de vigencia del Contrato presentado en la vista administrativa era de 30 de junio de 2005. Dicho Contrato, conforme testificó el Dr. Arana no había sido renovado. Otro factor de medular importancia lo es la contratación del personal especializado. Nada surge del expediente sobre la contratación de dichos empleados, los cuales laboran, al presente en Mepsi Center.

Asimismo, surge del testimonio del Dr. Arana, entre otros, su desconocimiento sobre la cantidad de enfermeras que tendría que utilizar para operar la facilidad propuesta. Tampoco pudo precisar los criterios clínicos a ser establecidos. Declaró que el Centro no poseería una facultad médica propia y que utilizaría los servicios de médicos generalistas de Mepsi Center. Por último, el Dr. Arana no presentó estados financieros de la corporación que pudieran reflejar su capacidad económica.

El recurrente nos plantea que la Oficial Examinadora *"reprodujo ad verbatim casi en su totalidad las Determinaciones de Hechos sometidas por Metrohealth en su Memorando de Derecho"*. A su vez, intima que la determinación del Secretario de Salud no puede descansar meramente en expresiones como las que se ha *"examinado y ponderado detenidamente todo el récord."* Sobre el particular, somos de opinión que este argumento es uno espúreo. Basta señalar que no tan sólo la Ley Núm. 7, *supra*, sino la citada Ley Núm. 170, disponen para el nombramiento de Oficiales Examinadores. En el caso de la citada Ley Núm. 7, se autoriza al Secretario de Salud a delegar sus funciones de celebrar las vistas administrativas para evaluar las solicitudes de Certificados de Necesidad y Conveniencia. Véase, 24 L.P.R.A. sec. 334f-7.

A su vez, la Sec. 3.3 de la Ley Núm. 170, *supra*, 3 L.P.R.A. sec. 2153, dispone que *"[t]oda agencia podrá designar oficiales examinadores para presidir los procedimientos de adjudicación que se celebren en ella"*.

Por otro lado, el recurrente en la discusión de sus errores constantemente apunta a que la Oficial Examinadora utilizó el Memorando de Derecho suscrito por Metrohealth. Sobre el particular, el Tribunal Supremo ha expresado que *"la costumbre existente en los tribunales de instancia de solicitar que las partes sometan proyectos de sentencia no es, de por sí, una mala práctica; la misma es el resultado del mucho trabajo, la presión del tiempo y la poca ayuda que tienen nuestros jueces de instancia. Dichos proyectos de sentencia, utilizados correctamente, alivian la pesada carga que llevan nuestros jueces, ya que les sirven como punto de partida o como papeles de trabajo (working papers) en la confección de la sentencia que finalmente emiten". Román Cruz v. Díaz Rifas*, 113 D.P.R. 500, 508 (1982); *Malavé v. Hosp. de la Concepción*, 100 D.P.R. 55 (1971).

Observamos que, conforme al ordenamiento jurídico, en el caso de autos, se celebró una vista administrativa, donde se desfiló evidencia. Asimismo, la actuación de la Oficial Examinadora fue dentro de las prerrogativas dispuestas por ley. No encontramos ningún indicio de que dicha funcionaria haya actuado más allá de las facultades conferidas. Tampoco detectamos ningún tipo de parcialidad por parte de la Oficial Examinadora.

En el caso de autos hemos evaluado los argumentos del recurrente, y a la luz de la totalidad del expediente, no detectamos motivos para intervenir con la determinación de la agencia. Somos de opinión que el recurrente no cumplió con los requisitos de ley para la expedición del Certificado de Necesidad y Conveniencia solicitado por lo que no medio abuso de discreción.

## V

Por los fundamentos antes esbozados, se confirma la Resolución recurrida.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones